SHELBY TYNDALL, PLAINTIFF, EMPLOYEE v. WALTER KIDDE CO., EMPLOYER AND NATIONAL UNION, CARRIER, DEFENDANTS

No. 9010IC815

(Filed 7 May 1991)

1. **Master and Servant § 68 (NCI3d)— machinist—dermatitis— occupational disease—not personal sensitivity**

    In a workers' compensation action where claimant machinist claimed that she had contracted an occupational disease, dermatitis, caused by a chemical with which she came into contact in the course of her employment, any reduction in her capacity to earn wages was the result of her occupational disease where the parties stipulated that she had an occupational disease and all of the evidence supported the conclusion that claimant's incapacity was the result of her occupational disease. Although respondent argued personal sensitivity under *Sebastian v. Hair Styling,* 40 N.C.App. 30, *Sebastian* applies only to those situations where an occupational disease does not exist.

    **Am Jur 2d, Workmen's Compensation §§ 229, 317.**

2. **Master and Servant § 68 (NCI3d)— machinist—dermatitis— failure to prove reduction in earning capacity**

    A machinist claiming dermatitis in a workers' compensation case failed to prove any reduction in her earning capacity

## TYNDALL v. WALTER KIDDE CO.

[102 N.C. App. 726 (1991)]

where her post-injury earnings were less than her pre-injury earnings, but the employer offered uncontested evidence that other jobs were available which paid wages equivalent to the pre-injury wages and which did not require exposure to the problem chemicals.

**Am Jur 2d, Workmen's Compensation § 348.**

3. **Master and Servant § 93.3 (NCI3d) — workers' compensation — machinist's dermatitis — expert testimony in labor market analysis — admissible**

The testimony of an expert in labor market analysis with particular emphasis on job analysis and evaluation and compensation rates was admissible in a workers' compensation action arising from claimant machinist's dermatitis where there was no dispute regarding claimant's capability to work in an environment free of the offending chemicals. The expert was competent to offer his opinion on claimant's capability of obtaining other employment where there would be no exposure to those chemicals.

**Am Jur 2d, Workmen's Compensation § 528.**

APPEAL by plaintiff from Opinion and Award of North Carolina Industrial Commission entered 1 May 1990. Heard in the Court of Appeals 13 February 1991.

*Lore & McClearen, by R. Edwin McClearen and F. Scott Templeton, for plaintiff-appellant.*

*Young, Moore, Henderson & Alvis, P.A., by Dean Webster and Dana Davis, for defendant-appellees.*

GREENE, Judge.

Shelby Tyndall (Claimant) appeals from an "Opinion and Award" of the Industrial Commission denying her claim for compensation.

The undisputed facts reveal that the Claimant in 1983 received a job with Walter Kidde Co. (Employer) as a machinist "C" "and with time and experience, became elevated to the position of machinist "B" at $8.51 per hour." The findings of fact adopted by the Commission state in part:

TYNDALL v. WALTER KIDDE CO.

[102 N.C. App. 726 (1991)]

4. [Employer] . . . manufactures fire control systems. Many of the parts are small and intricate. Precision gauges are used to measure these parts. As a part of [Claimant]'s duties she worked with machines which used cutting oils to lubricate and cool the tools in the metal process. The oil was applied by a spray device when a drill press was used. On the larger machines that were involved in several operations, a cooling system was in place that sprayed the cooling liquid from all directions on the part as well as the tool. A drain system is installed to catch the excess coolant that splashes off the part and recycles it through the cooling oil system.

5. Not only [Claimant], but other workers would often get this cooling oil on their hands or body as a necessary part of their job duties. Solcut 50 was a water-soluble coolant used in the machine shop. Also, a blue Monroe cooling solution was used in the machine shop as well. Different machines used different cooling solutions. Some used cutting oils.

6. In the spring of 1987, [Claimant] began to notice that she was developing dermatitis on her hands and arms. This rash looked like poison oak or ivy, and caused an itching sensation. Small blisters or bumps developed.

The Claimant sought treatment from her family doctor and was referred to Dr. Edward Burton (Dr. Burton), a Raleigh dermatologist. Dr. Burton determined that Claimant had "a chronic hand eczema which seems to be definitely accentuated by chemical exposure at work and is greatly improved when the patient ceases to work." Dr. Burton told Claimant that if she continued "to be exposed to these chemicals she [could] . . . expect to continue to have trouble with her hands probably for an indefinite period of time." Dr. W. Stacy Miller (Dr. Miller) also diagnosed Claimant as having a "chronic eczema" which he determined to be "related to chemicals she comes in contact with at work." Dr. Miller performed some tests on Claimant which revealed "positive skin test reactions to the blue Monroe and undiluted Solcut 50 solutions." Dr. Miller advised that Claimant "should *not* come into contact with these chemicals." He concluded that Claimant was "fully capable of working in another capacity where exposure to these chemicals will not be necessary." At some point after Claimant was examined by Dr. Miller and Dr. Burton, Claimant was told by Employer that there was a machinist "C" position open and Claimant re-

**TYNDALL v. WALTER KIDDE CO.**

[102 N.C. App. 726 (1991)]

quested a transfer to this position. On 1 September 1987, Claimant began working as a machinist "C" and was paid at the rate of $6.98 per hour. This work did not expose her to the irritating chemicals and coolants that she had been exposed to as a machinist "B." In April, 1989, Claimant quit her job with Employer and began working at the Johnston County Alcohol and Substance Abuse Facility earning $6.01 per hour. There is no evidence in the record that Claimant had "further experience of dermatitis after September 1, 1987 when her exposure" to blue Monroe and Solcut 50 ceased.

Employer offered the testimony of Joseph G. Kearney (Kearney) who testified that he specialized in "job evaluation: wage and salary administration and benefit analysis and compensation." He further stated that his work involved the "collecting of data and providing data in conjunction with compensation surveys and on the status of the labor market." He admitted that he was not an expert in the field of vocational evaluations. Kearney was accepted by the trial court as "an expert in labor market analysis with particular emphasis on job analysis and evaluation and compensation analysis." Kearney was asked on direct examination for his opinion as to whether Claimant, with her experience and qualifications, "would have the ability and opportunity to contract a job [in the area] paying a wage of at least $8.50 per hour" which did not expose her to "the Solene Solcut 50 cutting oil type substances." Claimant objected to the question on the ground that the question was outside "the range of [Kearney's] . . . expertise" and because Kearney did not do "vocational assessments with respect to [individuals] . . ." regarding that individual's capabilities and vocational potential. The trial court overruled the objection. Kearney testified that there were jobs available in the immediate area for persons with the experience of Claimant which would not have involved exposure to "Solcut 50 cutting oil type substances" and that those jobs paid at least $8.50 to $9.00 per hour. Claimant presented no evidence that she sought any employment at any place "where her extensive machinist skills and experience might [have been] . . . transferred."

At the hearing before the Industrial Commission on Claimant's claim, the parties stipulated that Claimant contracted an occupational disease, namely dermatitis, caused by a chemical which Claimant came into contact with in the course and scope of her employment with Employer.

TYNDALL v. WALTER KIDDE CO.

[102 N.C. App. 726 (1991)]

The Commission determined that Claimant was not entitled to compensation for two distinct reasons. First, Claimant did not have a compensable disability because her alleged incapacity "was the result of her personal sensitivity to chemicals used in her work rather than from an occupational disease." Second, even if the disability was compensable, Claimant incurred no reduction in her earning capacity because she could have earned the same wages at other firms in the area where she lived without being exposed to the problem chemicals.

---

The issues are: (I) whether Claimant has a compensable disability; (II) whether Claimant incurred a reduction in earning capacity; and (III) whether Kearney was competent to testify as to the capabilities of Claimant to obtain other employment.

Every employer, as that term is defined in N.C.G.S. § 97-2(3) is obligated to pay compensation "for personal injury or death by accident arising out of and in the course of his employment. . . ." N.C.G.S. § 97-3. "Disablement or death of an employee resulting from an occupational disease . . . shall be treated as the happening of an injury by accident. . . ." N.C.G.S. § 97-52. "Disablement" is defined as the equivalent of "disability." N.C.G.S. § 97-54. "Disability" is defined as an "incapacity . . . to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C.G.S. § 97-2(9).

Therefore, an employee is entitled to compensation under the Workers' Compensation Act (Act) if there is an "incapacity ['resulting from an occupational disease'] to earn wages which the employee was receiving at the time [the occupational disease developed] . . . in the same or any other employment." Thus, Claimant's post-injury earning capacity is the determinative factor in assessing disability. A claimant's "actual post-injury earnings will create a presumption of earning capacity commensurate" with the post-injury earnings. 2 Larson's Workmen's Compensation Law § 57.21(d), 10-113. However, this presumption may be rebutted by either party. *Id.* If the post-injury earnings are equal to the pre-injury earnings, the claimant may attempt to explain "away the post-injury earnings as an unreliable basis for estimating capacity." *Id.* at 10-125. If the post-injury earnings are less than the pre-injury earnings, the employer may present evidence that there are other available jobs for which the claimant is qualified and which pay equivalent to

**TYNDALL v. WALTER KIDDE CO.**

[102 N.C. App. 726 (1991)]

or greater than the claimant's pre-injury earnings. *See American Metals Climax, Inc. v. Cisneros*, 195 Colo. 163, 576 P.2d 553 (1978).

The burden of proof rests upon the claimant to prove the "existence of his disability and its extent." *Hendrix v. Linn-Corriher Corp.*, 317 N.C. 179, 185, 345 S.E.2d 374, 378 (1986). Relevant on these issues is evidence that the claimant may be unsuited for particular employment "due to characteristics peculiar to him." *Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 596, 290 S.E.2d 682, 684 (1982).

I

[1] Employer, relying on *Sebastian v. Hair Styling*, 40 N.C. App. 30, 251 S.E.2d 872, *disc. rev. denied*, 297 N.C. 301, 254 S.E.2d 921 (1979) (claimant's incapacity was result of personal sensitivity not occupational disease), argues that Claimant's incapacity, if any, was the result of a personal sensitivity to chemicals not the result of an occupational disease. We disagree. *Sebastian* applies only in those situations where an occupational disease does not exist. *See Thomas v. Hanes Printables*, 91 N.C. App. 45, 50, 370 S.E.2d 419, 422 (1988) (court in *Sebastian* was unconvinced that claimant's "personal sensitivity" met the definition of an occupational disease). The issue of whether Claimant's dermatitis was an occupational disease is not here presented because the parties stipulated that the Claimant had an occupational disease. Therefore, *Sebastian* is not here applicable. Furthermore, all the evidence supports a conclusion that Claimant's incapacity, if any, was the result of her occupational disease. It is undisputed that the Claimant could not continue to work as a machinist "B" because it exposed her to chemicals that caused dermatitis. Therefore, any reduction in Claimant's capacity to earn wages was the result of Claimant's occupational disease.

II

[2] Employer argues that Claimant has failed in her ultimate burden of proving any reduction in her earning capacity. We agree. When Claimant presented evidence of her "post-injury" earnings, a presumption was created that her earning capacity was consistent with those earnings. 2 Larson's Workmen's Compensation Law § 57.21(d), at 10-113. In that her "post-injury" earnings were less than her "pre-injury" earnings, there was proof of a reduction in Claimant's earning capacity. However, Employer offered un-

contested evidence that other jobs were available which Claimant was capable of getting and which paid wages equivalent to her "pre-injury" wages and that these jobs did not require exposure to the problem chemicals. *Kennedy v. Duke University Medical Center*, 101 N.C. App. 24, 33, 398 S.E.2d 677, 682 (1990) (after claimant meets initial burden, burden on employer to "show not only that suitable jobs are available, but also that the plaintiff is capable of getting one . . ."). With the introduction of this evidence by Employer, it was incumbent upon Claimant to dispute this evidence or show that she had unsuccessfully sought such other employment. *Bridges v. Linn-Corriher Corp.*, 90 N.C. App. 397, 400, 368 S.E.2d 388, 390, *disc. rev. denied*, 323 N.C. 171, 373 S.E.2d 104 (1988) (the ultimate question is whether the claimant can obtain the job). Here, Claimant presented no evidence contesting the availability of other jobs or her suitability for those jobs and furthermore presented no evidence that she sought employment at any of these places. Accordingly, Employer offered sufficient evidence to rebut the presumption that Claimant sustained a reduction in her earning capacity. The Commission found facts consistent with the Employer's evidence and those findings support the conclusions of the Commission that there did not exist any disability. *Hilliard*, 305 N.C. at 595, 290 S.E.2d at 684 (if competent evidence in the record to support findings, appellate court is bound).

III

[3] Claimant argues that Employer's evidence offered through Kearney regarding Claimant's capability of obtaining other employment was incompetent in that his testimony was "an excursion well beyond his bounds of expertise in 'labor market analysis with particular emphasis on job analysis and evaluation and compensation rates.' " We disagree.

Since there was no dispute regarding Claimant's capability to work in an environment free of the offending chemicals, Kearney was competent to offer his opinion on Claimant's capability of obtaining other employment where there would be no exposure to the offending chemicals.

We have reviewed Claimant's additional assignments of error and find them to be without merit.

Affirmed.

Judges WELLS and WYNN concur.