The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Edward Garner, Jr. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Employer-Employee relationship existed between the Plaintiff and the Defendant Employer.
3. The CNA Insurance Company was the compensation carrier on the risk.
4. Plaintiff's average weekly wage was $662.30, which yields a compensation rate of $426.00 per week.
5. Plaintiff suffered an injury by accident on September 25, 1992, resulting in an injury to his back.
6. The Defendant-employer admitted liability and the parties entered into a Form 21 Agreement.
7. A Form 24 Agreement was approved by the Industrial Commission on September 16, 1993.
8. The issues to be determined by the Commission are what is the extent of Plaintiff's disability and what additional compensation, if any, is Plaintiff entitled to receive.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing, Plaintiff was 47 years old, and although he only completed the 9th grade, he is fully able to read and write, and is familiar with handling paperwork in connection with various jobs and from operating his own business.
2. Prior to Plaintiff's employment with the defendant-employer, he worked as a driver for another company, and had also done some construction and carpentry work. Also, at approximately the time of the injury giving rise to this case, Plaintiff began running a bar called Mike's Lounge and he continued to operate that business through at least 1993.
3. Prior to September 25, 1992, Plaintiff has been involved in a number of accidents and on-the-job injuries. Plaintiff had previously suffered a stab wound to his chest in a fight, and in July 1982, he was involved in a serious automobile accident. In that accident, his car struck a telephone pole head-on, and he suffered multiple injuries, including serious injuries to his back and neck. Plaintiff was still under medical treatment for that injury more than a year after the accident, and was treated by several doctors for lengthy periods, including a chiropractor and a neurologist. Plaintiff also had been told that he suffered a "cracked vertebrae" in his back in that accident.
4. As a result of the automobile accident, Plaintiff filed a lawsuit in which he claimed that he had suffered severe and permanent injuries, loss of earnings, and on-going pain and suffering. Plaintiff claimed in his lawsuit that more than a year after this accident, he was still unable to engage in recreational activities, such as riding horses or going out on his boat.
5. Plaintiff had also suffered severe on-the-job injuries prior to 1992. In 1986, he injured his left shoulder and neck, when he fell out of a truck while working for Goldston Transfer. Plaintiff received chiropractic treatment at that time, and was diagnosed as having a possible disc injury in his neck. In October 1990, Plaintiff suffered another fall while unloading a truck, and filed a workers' compensation claim against the Defendant-employer, Golden State Foods. Plaintiff claimed an injury to his right knee in this incident, underwent arthroscopic surgery, and was out of work until July 1991. Plaintiff was also told during treatment for this injury that he had suffered degenerative or possible arthritic changes in his knee.
6. Plaintiff has suffered several other injuries, including an eye injury only several days before the incident giving rise to this case. For that incident, Plaintiff was seen in the emergency room on September 18, 1992 and September 20, 1992. Thus, prior to September 25, 1992, Plaintiff had suffered a number of falls, had been involved in as many as five to six workers' compensation claims, and had filed a lawsuit in which he claimed to have suffered severe and permanent injuries, including back injuries, as a result of an automobile accident.
7. On September 25, 1992, Plaintiff was making a delivery at a McDonald's located in Carolina Beach. While moving a tray of hamburger buns, he slipped and struck his left hip area against a stack of packaged (frozen) french fries.
8. After the fall, Plaintiff completed the rest of his deliveries, and made the return drive from Carolina Beach to Winston-Salem. The next day, Plaintiff visited the Wesley Long Hospital Emergency Room in Greensboro. The emergency room physician examined Plaintiff, and took x-rays, the results of which were normal, except that they revealed significant degenerative changes in Plaintiff's back. The emergency room physician suggested that Plaintiff remain out of work for 48 hours, and that he then return to work with light duty restrictions.
9. On September 29, 1992, Plaintiff was seen by Dr. Fernandez at Health Hygiene, Inc., and at that time, Plaintiff was tender in the left hip area, but was able to do straight leg raising completely with some pain. Dr. Fernandez concurred with the emergency room's doctor's conclusion that Plaintiff could continue to work, and released him to light duty, with restrictions of no lifting more than 20 pounds and no driving. Plaintiff returned to work with the Defendant-employer, and worked on light duty with limited lifting until October 21, 1992. During this time, Plaintiff continued to be seen by the doctors at Health Hygiene, and continued to be released to work with restrictions.
10. After weeks of working light duty, Plaintiff left work because the Defendant-Employer did not have any further light duty available at that time. Plaintiff continued to be seen by doctors at Health Hygiene, and in October 1992, he was referred for further evaluation by an orthopaedic surgeon, Dr. Phillips Carter.
11. During this time, Plaintiff was also running his business, Mike's Lounge, and he continued to engage in various physical activities in connection with that business. For example, in December 1992, Plaintiff reported that his back was worse after he had reached under a sink at home and carried a case of soft drinks. Plaintiff has also, on several occasions, been involved in altercations at the bar in which he had suffered some injury.
12. Dr. Carter, who has been a board certified orthopaedic surgeon since 1972, first examined Plaintiff on October 21, 1992. At that time, Plaintiff did not give Dr. Carter any prior history of back problems, and specifically, Dr. Carter was never made aware of Plaintiff's prior on-the-job injuries or his serious automobile accident in 1982. Based on his initial examination of the Plaintiff on October 21, 1992, Dr. Carter felt that Plaintiff has suffered a contusion, or bruise, in the fall on September 25, 1992, and he recommended that Plaintiff continue working with restrictions.
13. When Plaintiff continued to complain of symptoms, Dr. Carter ordered an MRI and bone scan, and those tests revealed degenerative disc disease at virtually all levels of Plaintiff's lumbar spine, including facet degeneration at multiple levels. Plaintiff also had arthritic changes (fusion) at the sacroiliac joints and suffered a separate degenerative condition of sacroiliitis. Dr. Carter explained during his deposition that both of these degenerative conditions had developed over a number of years, and were present well prior to September 1992. Neither degenerative condition was caused by the injury in September 1992 or exacerbated by it. Specifically, in response to Plaintiff's attorney's question, Dr. Carter testified as follows:
 Q. Could the injury that he had — the minor trauma that he had — set off all of this that's going on with him now?
 A. And I just don't think that's possible. I think there comes a point in your life when it catches up with you, and that's what has caught up with him now; and this is an incidental thing that has happened when he fell. And that's my feeling, and I'm not going to change my opinion. . .
Dr. Carter further explained during his deposition that he did feel that Plaintiff had suffered a possible stretch injury to the sacroiliac area in the fall, and that based on Plaintiff's subjective complaints of on-going discomfort, he assigned Plaintiff a 7% permanent partial disability rating related to the fall. Dr. Carter considered Plaintiff's overall disability to his back to be 40% with the remaining 33% of that total caused solely by Plaintiff's on-going degenerative conditions. In fact, when questioned further by Plaintiff's attorney, Dr. Carter explained that pursuant to normal guidelines, the 7% rating was actually generous, given that Plaintiff had no objective signs of any on-going injury related to the fall.
14. By January 1993, Dr. Carter felt that Plaintiff's condition, at least to the extent that any of it related to the fall, had stabilized, but because Plaintiff was still complaining of subjective symptoms, he referred Plaintiff for a second opinion by a neurosurgeon, Dr. Nudelman. Plaintiff was evaluated by Dr. Nudelman on February 16, 1993, and after a complete examination, Dr. Nudelman concluded that no further diagnostic work was needed, and that Plaintiff did not need surgery.
15. Dr. Carter confirmed that as of February 1993, Plaintiff was at maximum medical improvement with respect to any condition related to the September 1992 fall, and retained only the 7% permanent partial disability related to the fall. As of that time, Dr. Carter did not feel that Plaintiff needed any further treatment related to any injury suffered in the fall. Although he suggested that Plaintiff not return to a driving job, that restriction was based on the on-going degenerative condition, and not based on the fall. In fact, Dr. Carter encouraged Plaintiff to try sedentary or light duty work.
16. Plaintiff underwent a functional capacities evaluation in February 1993, and was rated as being able to work at the light-medium level. After undergoing the functional capacities evaluation, and being released by Dr. Carter and Dr. Nudelman, Plaintiff was seen back at Health Hygiene, and was likewise released to return to work with restrictions. Specifically, Dr. Compton set forth Plaintiff's lifting and other restrictions in a letter dated March 4, 1993. By letter written several weeks later, Dr. Compton also stated that he concurred with Dr. Carter's 7% permanent partial disability impairment rating.
17. Plaintiff was last seen for any active treatment for his back in July 1993, and he had received no further treatment as of the time of the hearing in this case. Plaintiff did return to Dr. Carter in March 1994, and at that time complained for the first time of some symptoms in his upper extremities. Dr. Carter felt that these symptoms were related to Plaintiff's on-going degenerative arthritis, and not related to Plaintiff's on-the-job injury in September 1992.
18. Instead of attempting to return to work, Plaintiff applied for Social Security disability benefits, which application was denied. Plaintiff also began collection of disability payments under multiple private insurance plans, and he continued to receive income from these sources through the date of the hearing. Even though all, or at least the vast majority, of Plaintiff's on-going work restrictions were related to his degenerative conditions, and not to any injury suffered in the September 1992 fall, Defendants arranged for vocational assistance for the Plaintiff, and continued to make weekly benefit payments to him while providing him assistance in locating a job.
19. By early July 1993, the vocational specialist assigned to the case had located a job for Plaintiff, and an interview was set up for him with Ablest Temporary Services on July 8, 1993. Plaintiff arrived 30 minutes late, and immediately began complaining to the interviewer about alleged pain that he was having. The interviewer nevertheless advised Plaintiff of a job that was available involving packaging of cigarettes and pharmaceuticals, but Plaintiff told her that he had been "informed by his attorney not to make any commitments to anything at this time." Despite Plaintiff's behavior, the interviewer nevertheless encouraged him to obtain the additional documentation needed to complete his application, but Plaintiff made no attempt to do so.
20. Despite Plaintiff's refusal to attempt this job, Defendants continued to provide vocational assistance to him, and another job was located for him in August 1993. On August 3, 1993, the vocational counselor sent Plaintiff and his attorney a letter advising of an interview that had been arranged for August 10, 1993, with Burns International Security located in Greensboro. Plaintiff failed to appear for the interview, and admitted at the hearing the he made no attempt to obtain or perform this job that was made available to him. At the hearing, Plaintiff first claimed that he did not receive the letter advising of the interview until the day before, but he had to admit otherwise when shown a copy of the return receipt where he signed for the letter on August 5, 1993, five days before the scheduled interview. Plaintiff then claimed that he did not attend the interview on August 10, 1993, because he had a doctor's appointment on that day, but was unable to remember which doctor it was he saw, and not one of the almost 200 pages of medical records in this case indicate any appointment or evaluation of Plaintiff by any physician on August 10, 1993. Finally, Plaintiff acknowledged that he made no effort to attend this interview because his lawyer had told him not to attempt any work.
21. At the time that Plaintiff refused to even attempt these jobs, he had been released to work by all of the physicians who have treated him for his back, and the only medical attention he was receiving consisted of periodic visits to Dr. Roy Clemmons, a psychiatrist to whom Plaintiff was referred by his lawyer. None of the physicians who treated Plaintiff's back, however, referred him to Dr. Clemmons, and to the contrary, Dr. Carter testified that no further treatment was necessary and specifically he did not make any referral or suggestion for psychiatric care. Further, when Plaintiff attempted to refile for social security disability benefits, claiming psychiatric disability, an independent evaluation by Dr. Edward Rhoads revealed that Plaintiff's claimed psychiatric problems did not significantly limit his ability to work.
22. Finally, after seeking out no active treatment of his back for well more than one year, Plaintiff traveled to Ashland, Virginia to be evaluated by Dr. Compton on December 12, 1994.
23. Dr. Compton indicated that the deterioration he saw in Plaintiff's condition as of December 1994 was the result of spreading of the rheumatoid arthritis condition that Plaintiff had, including complaints that Plaintiff was making of on-going and more severe problems in his neck and upper extremities. Dr. Compton is of the opinion that there is no evidence in this particular type of arthritis that injury or any type would cause it to start up or cause it to flare up. Finally, Dr. Compton stated that "there's no data to draw upon that this injury at Golden State activated the arthritic condition."
24. Dr. Compton agreed with Dr. Carter that Plaintiff has suffered from degenerative conditions separate and apart from the sciatic nerve stretch injury he may have suffered in the fall, and he again confirmed that there is no causal connection between the sciatic stretch injury and the on-going arthritic conditions. Finally, while Dr. Compton testified that he felt that Plaintiff was unable to engage in any employment as of December 1994, he also acknowledged that his opinion in that regard was based on Plaintiff's degenerative conditions alone and not on the sciatic stretch injury.
25. Plaintiff's continuing disability is not casually related to the original injury by accident.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. In order to obtain compensation under the Workers' Compensation Act, a claimant has the burden of proving the existence of disability and its extent. Kennedy v. Duke Univ. Medical Center, 101 N.C. App. 24,29, 398 S.E.2d 677, 680 (1990); Hilliard v, Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682, 683 (1982). Disability is defined in the Act as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment." N.C. Gen. Stat. § 97-2 (9). To satisfy his substantial burden of proving disability, or Supreme Court has repeatedly held that the Plaintiff must show:
 (1) That [he] was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) That [he] was incapable after injury of earning the same wages he had earned before his injury in any other employment, and (3) That [his] incapacity to earn was caused by [his] injury.
Hilliard, 305 N.C. at 595, 290 S.E.2d at 683. See also Russellv. Lowe's Prod. Distribution, 108 N.C. App. 762, 425 S.E.2d 454,456 (1993). In this case, while Plaintiff presented evidence that he was unable to return to his former employment, he failed to prove the second prong of the Hilliard test — incapacity to earn wages in other employment.
2. Recently, the Court of Appeals elaborated upon this second prong of the Hilliard test by setting forth four separate ways in which an employee may satisfy his burden of proof:
 The burden is on the employee to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment. Hillard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 684
(1982). The employee may meet this burden in one of our ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work-related injury, incapable of work in any employment, Peoples, 316 N.C. at 443, 342 S.E.2d at 809; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment, id., at 444 S.E.2d at 809; 1C A. Larsen, The Law of Workmen's Compensation, § 57.61 (d) (1992); (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, lack of education, to seek other employment, Peoples, 316 N.C. at 444, 342 S.E.2d at 809; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Tyndall v. Walter Kidde Co., 102 N.C. App. 726, 730, 403 S.E.2d 548, 550, rev. denied, 329 N.C. 505, 407 S.E.2d 553 (1991).
Russell, 108 N.C. App. at 765, 423 S.E.2d at 456. See alsoGrantham v. R.G. Barry Corp., 115 N.C. App. 293, 300-301,444 S.E.2d 659, 664 (1994). In this case, Plaintiff failed to satisfy any of the four methods of establishing disability set forth inRussell.
3. If a Plaintiff meets the initial burden of proving disability, the burden then shifts to the defendants to show that the Plaintiff is capable of earning wages and that suitable jobs are available. See also Burwell v. Winn-Dixie Raleigh, Inc.,114 N.C. App. 69, 441 S.E.2d 145 (1994). In this case, however, even if the burden shifted to defendants, they clearly satisfied that burden by presenting evidence of specific jobs that were made available to Plaintiff and were within his medical restrictions.
4. Under the Workers' Compensation Act, a claimant must establish that his disability was caused by an injury by accident arising out of and in the course of the employment. See O'Mary v.Land Clearing Corp., 261 N.C. 508, 135 S.E.2d 193 (1964). If the claimant wishes to be entitled to benefits, he has the burden of proof to show a clear casual connection between an identified accident and the condition allegedly causing disability. SeeClick v. Pilot Freight Carriers, 300 N.C. 164, 265 S.E.2d 398
(1980). In this case, all of the evidence establishes that Plaintiff suffers from severe and progressive degenerative arthritic conditions that are wholly separate from and independent of any on-the-job injury suffered in September 1992.
5. Since Plaintiff reached maximum medical improvement on July 8, 1993, and suffered a seven percent (7%) permanent partial impairment to the back, he is entitled to permanent partial disability benefits at the rate of $426.00 per week for twenty-one (21) weeks. N.C. Gen. Stat. § 97-31.
6. Since Defendants continued paying Plaintiff until September 16, 1993, they are entitled to a credit in the amount of ten and one seventy (10 1/7) weeks. Therefore, Plaintiff is entitled to permanent partial disability benefits in the amount of $426.00 for ten and six seventh weeks (10 6/7) weeks since the Defendants are entitled to a credit.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay compensation to Plaintiff at the rate of $426.00 per week for ten and six seventh (10 6/7) weeks. This compensation has accrued and shall be paid to Plaintiff in a lump sum subject to the attorney's fee hereinafter approved.
2. Plaintiff's claim for any other compensation for this injury is hereby denied.
3. An attorney's fee in the amount of twenty-five percent (24%) of the award is hereby approved for Plaintiff's counsel. Said amount shall be deducted from the aforesaid award and paid directly to Plaintiff's counsel.
4. Defendant's shall pay the costs due the Commission.
 S/ ________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ________________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ________________________ THOMAS J. BOLCH COMMISSIONER
DCS:bjp