The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lorrie L. Dollar and the briefs before the Full Commission. The parties waived oral argument before the Full Commission. The appealing party has shown good ground to reconsider the evidence and upon such reconsideration the Full Commission has decided to amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of the Deputy Commissioner with some modification.
***********
The Full Commission finds as fact and concludes as matters of law the following:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured, with Alexsis, Inc. as its servicing agent.
3. An employee-employer relationship existed between the parties at all relevant times.
4. On May 31, 1996, the plaintiff sustained an admittedly compensable injury to her right foot when she fell or misstepped from the route truck. The defendant filed a Form 60, Employer's Admission of Employee's Right to Compensation on June 17, 1996.
5. The plaintiff's average weekly wage was $658.43, which yields a compensation rate of $438.98.
6. The plaintiff received a salary continuation until June 9, 1996.
7. The parties submitted thirty-seven pages of medical records into evidence.
***********
Based upon all of the competent evidence of record, the Full Commission makes findings of fact as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, the plaintiff was a 39-year-old female who resided in Conover, Catawba County, North Carolina. She began working for the defendant as a part-time route courier in 1989. In approximately 1992, she was upgraded to a full-time employee.
2. As a courier, plaintiff's duties involved loading and driving a route truck to pick up and deliver packages for defendant's package delivery service.
3. As a full-time employee, the plaintiff worked four days per week for ten to eleven hours per day. At the time of her injury, plaintiff was earning $13.68 per hour for an average workweek of 48.13085 hours.
4. On May 31, 1996, plaintiff sustained an injury to her right foot while working for defendant. On that date, plaintiff was climbing into her work vehicle when she was startled by an automobile horn and fell. As a result of her fall, plaintiff injured her right foot. Subsequently, plaintiff sought immediate medical treatment.
5. Plaintiff's claim was accepted by defendant as compensable, pursuant to a Form 60 dated June 17, 1996. As a result of the injuries sustained on May 31, 1996, plaintiff received medical treatment from various physicians from the date of the accident until March 5, 1998, a period of almost two years.
6. Plaintiff initially treated with Dr. Glenn at the Medical Arts Clinic, and followed a course of treatment with Dr. Glenn through June 17, 1996. Dr. Glenn diagnosed the plaintiff as suffering from a contusion to her right foot.
7. Plaintiff subsequently treated with Dr. Herb Schulten at Catawba Orthopedic Specialists through October 4, 1996. Dr. Schulten diagnosed the plaintiff as suffering from medial sesamoiditis of the right great toe. He recommended that the plaintiff wear a metatarsal bar in her shoe and take anti-inflammatory medication.
8. On August 2, 1996, the plaintiff treated with Dr. Campbell at Catawba Orthopedic Specialists and received an injection in the region of her medial sesamoid, which provided temporary relief of her symptoms. When the plaintiffs symptoms did not improve, Dr. Schulten referred the plaintiff to Dr. Lowell Gill, a foot specialist at the Miller Orthopaedic Clinic. The plaintiff treated with Dr. Gill from November 26, 1996, through March 24, 1997. On October 26, 1996, Dr. Gill diagnosed the plaintiff with sesamoiditis and directed that the plaintiff be placed in a post-op shoe and allowed to return to office-type duties with periods of sedentary work. He also indicated he did not feel that the plaintiff was capable of returning to her full-time duties with the defendant.
9. On December 10, 1996, Dr. Gill found plaintiff capable of returning to light duty office-type work. He noted plaintiff was not capable of returning to her regular job. No light duty job was offered.
10. On June 18, 1997, the plaintiff began treating with Dr. Robert Anderson at the Miller Orthopaedic Clinic. Dr. Anderson's impression was that the plaintiff was suffering from metatarsal sesamoid disease, as well as possibly an impaction injury secondary to her initial injury. On August 21, 1997, Dr. Anderson performed surgery on the plaintiff's right foot. On December 5, 1997, Dr. Anderson cleared the plaintiff to return to work at modified duties. He indicated that she should avoid climbing, squatting, and excessive walking and standing. He also noted that she should avoid lifting heavy loads, but that she would continue to improve over the following eight months.
11. On May 5, 1998, Dr. Anderson rated the plaintiff with a ten percent (10%) permanent partial impairment to her right foot, which would entitle her to 14 weeks of compensation. He also noted that it was unlikely that the plaintiff could return to her prior employment as it required a considerable amount of standing and walking, as well as lifting and carrying and climbing. Dr. Anderson released the plaintiff to return to work with restrictions, which included not lifting objects which weighed in excess of fifty (50) pounds, no stair climbing or ladder climbing, no standing for more than four (4) hours per an eight-hour shift, and no squatting.
12. By memorandum dated May 18, 1998, Stan Tolliver, a manager with defendant-employer, offered plaintiff a part-time customer service representative position at the Hickory Service Center to begin on May 26, 1998. The part-time job paid $13.40 per hour for five hours per day, Monday through Friday and rotating on Saturdays for an eight-hour shift. Assuming four Saturdays in each month, this job would pay an average weekly wage of $388.60 compared to the average weekly wage of $658.43 she was earning before the injury.
13. Mr. Tolliver advised plaintiff in the memorandum of her options under the defendant's policy as (1) accepting the position offered, (2) applying for lateral or lower level positions during a ninety-day period, or (3) being terminated at the end of the ninety-day period if she had found no other job.
14. On or before May 26, 1998, the plaintiff received the memorandum and verbally advised the defendant that she had no desire to accept the part-time customer service representative job after she had been a full-time courier.
15. The part-time customer service representative job was within the medical restrictions and was a regular job available in the competitive market with the defendant-employer. The job was suitable to plaintiff's capacity. However, the part-time job would carry only approximately 2/3 the wages of her former employment and thus was not a suitable substitute for her pre-injury job.
16. Due to her compensable injury, plaintiff was unable to earn wages for the period from May 31, 1996, until May 26, 1998, when a part-time job she was offered by her employer was to begin. This part-time job would pay her only $388.60 per week compared to her pre-injury wages of $658.43, establishing a continuing wage loss of $269.83 per week.
17. As a result of plaintiff's failure to accept the job or to obtain other employment with the defendant within ninety days, her employment was terminated on October 12, 1998, in accordance with defendant's policy which was uniformly applied.
18. The plaintiff complained that another employee with less seniority was hired into a full-time customer service representative job which became available in September of 1998. However, this position became available after plaintiff's ninety days had expired; and she failed to apply for the job even though she had checked the job listings and was familiar with the manner by which she should apply for a posted position.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. An employee seeking disability must establish the existence and extent of her disability. Franklin v. Broyhill FurnitureIndustries, 123 N.C. App. 200, 472 S.E.2d 382(1996), citingRadica v. Carolina Mills, 113 N.C. App. 440, 447,439 S.E.2d 185, 190(1994). Disability refers to decreased earning capacity. Tyndall v. Walter Kidde Co., 102, N.C. App. 726, 730, 403 S.E.2d 548, 550, disc. rev. denied, 329 N.C. 505,407 S.E.2d 553(1991). Payment pursuant to N.C. Gen. Stat. §97-18(b) shall constitute an award of the Commission on the question of compensability of and the insurer's liability for the injury for which payment was made. N.C. Gen. Stat. § 97-82(b)
2. Once the plaintiff has established the existence of the disability, the defendant bears the burden of proving that suitable jobs are available and the plaintiff is capable of getting one. Burwell v. Winn-Dixie Raleigh, Inc.,114 N.C. App. 69, 73, 441 S.E.2d 145, 149(1994). App. 730,471 S.E.2d 662(1996). Based upon the evidence, the plaintiff was medically released to return to work with restrictions, and the defendant offered the part-time customer service representative job which was suitable to those restrictions. Therefore, she is not entitled to temporary total disability compensation on or after May 26, 1998. However, she was entitled to make an election between her rating (10% permanent partial disability of the foot, yielding 14 weeks of total compensation) or 2/3 of the continuing wage loss (2/3 of $269.83 for that part of 300 weeks from the date of injury that remained when temporary total compensation ended on May 26, 1998). Approximately 196 weeks remained and 196 times $179.87 is in excess of $35,000 while 14 times $438.98 is slightly more than $6,000. N.C. Gen. Stat. §§ 97-30, 97-31.Gupton v. Builders Transport, 320 N.C. 38, 43,357 S.E.2d 674 (1987); Gray v. Carolina Freight Carriers,Inc., 105 N.C. App. 480, 489, 414 S.E.2d 102 (1992).
3. The defendant is entitled to a credit for any overpayment of temporary total disability benefits.
4. Plaintiff is entitled to have the defendant pay all medical expenses incurred or to be incurred as a result of the compensable injury. N.C. Gen. Stat. §§ 97-2(19); -25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the reasonable attorney's fee set forth below, the defendant shall pay temporary total disability at the rate of $438.98 per week from May 31, 1996 through May 26, 1998, and shall pay wage loss at the rate of $179.87 per week for the 196 weeks of the 300 weeks from the date of accident that remained at the end of her temporary total disability entitlement. The $179.87 shall be reduced by 2/3 of her earnings to the extent than plaintiff earns more than $388.60 per week during any of the 196 weeks. The defendant is entitled to a credit for any overpayment and a credit for any salary continuation wholly funded by the employer.
2. A reasonable attorney's fee of twenty-five percent of the compensation awarded plaintiff in paragraph 1 is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel. Lump sum payments shall be made for all compensation due as of the date of this Opinion and Award and interest shall be paid at 8% per annum on all unpaid amounts from the date of the hearing before the Deputy Commissioner.
3. The defendant shall pay all medical expenses incurred or to be incurred as a result of the compensable injury.
4. The defendant shall pay the costs.
This 9th day of September 1999.
S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
S/_____________ LAURA K. MAVRETIC COMMISSIONER