**FRIT INDUSTRIES and South Carolina Insurance Co., Petitioners–Appellants,**

v.

**Virgil LANGENWALTER, Respondent–Appellee.**

No. 88–340.

Court of Appeals of Iowa.

April 25, 1989.

Jerry C. Estes of Estes & Opheim, Fort Dodge, for petitioners-appellants.

T.J. Braunschweig, Algona, for respondent-appellee.

Heard by OXBERGER, C.J., and DONIELSON and HAYDEN, JJ.

OXBERGER, Chief Judge.

Petitioners-appellants Frit Industries and South Carolina Insurance Co. (Frit) appeal the district court decision affirming the Industrial Commissioner's finding respondent-appellee Virgil Langenwalter has been twenty-five percent industrially disabled due to lead poisoning he experienced while

working at Frit Industries. We find substantial evidence supports this conclusion and affirm the district court's decision. Mr. Langenwalter's cross-appeal seeking a finding he had 100 percent industrial disability is denied.

The Industrial Commissioner made the following findings of fact essentially adopted by the district court.

Virgil worked primarily as a maintenance leadman for Frit Industries from August 23, 1974, until discharged April 29, 1982. He was forty years old at the time of the deputy commissioner's hearing in May 1985. Although functionally illiterate, Virgil has also worked as an auto mechanic, assembly line worker, roofer, painter and die maker.

In early 1982 Virgil began suffering from migraine headaches, muscle fatigue, memory loss, irritability and decreased sexual drive. In March he had tests taken to check the lead content of his blood. Two tests indicated his blood lead level count to be 72 ug/dl and 71 ug/dl, as compared to the adult normal range of zero to 30 ug/dl (micrograms per deciliter). Frit moved Virgil to what was considered a safer work area in terms of lead exposure. On April 13, tests showed his lead level to be 63 ug/dl. On April 29, 1982, Frit dismissed Virgil for insubordination. He and his family relocated in Fort Madison, Iowa where his wife got a job as a motel manager.

After an arbitration hearing was held pursuant to union contract terms, Virgil was reinstated as maintenance leadman with Frit on November 15, 1982. The arbitrator found Virgil was wrongfully discharged for refusing to work in an environment that was not lead-free and awarded him full back pay.

He began work with a blood lead level of 27 ug/dl in what Frit considered a relatively lead-free environment. Virgil took sick leave on November 23, 1982. On December 2, his blood lead level was tested as 29.5 ug/dl. Virgil's doctor advised him to remain off work for two weeks until results from further tests could be obtained. Frit requested, and Virgil agreed to be tested by an Iowa City doctor and a doctor in Fort Dodge. For reasons not clear in the record, results of these tests were not reported by December 20 as hoped.

Virgil received a letter from Frit on December 22, stating if he failed to come to work on December 28, he would be terminated from employment. Virgil did not report to work, having not received further test results, and was dismissed. On January 3, 1983, Virgil's blood lead level was 29 ug/dl.

Virgil has not been employed since his December 28, 1982 dismissal. On February 15, 1984, a toxicology expert suggested by Frit tested Virgil's blood lead level at 27 ug/dl and said he found no current signs of lead intoxication or permanent disablement from past lead exposure. The symptoms Virgil experienced in early 1982 persisted to a lesser degree to the time of the May 1985 hearing. The record reveals Virgil is a recovering alcoholic who has abstained from drinking since early 1982. He also suffers from high blood pressure and adult onset diabetes. These illnesses, along with his past history of lead exposure, have prevented Virgil from obtaining health insurance.

On appeal, Frit alleges several errors but essentially contends the district court erred in concluding there was substantial evidence to support the commissioner's conclusion (1) Virgil contracted an occupational disease due to his exposure to lead while working at Frit Industries, (2) Virgil has been twenty-five percent industrially disabled.

The principles applicable to our judicial review were recently summarized as follows:

A review of the industrial commissioner's decision is governed by Iowa Code section 17A.19.... The scope of review is not de novo.... The commissioner's findings have the effect of a jury verdict.... Those findings are applied broadly and liberally to uphold rather than defeat the commissioner's decision; they are binding on appeal unless a contrary result is demanded as a matter of

**90**

law.... The above rules are applicable in the district court review. We review the district court's appeal decision for errors of law. In this pursuit we reapply the section 17A.19(8) standards to the agency action to determine whether our conclusions are the same as those of the district court.

The question on judicial review is not whether the evidence might support a *different* finding but whether evidence supports findings the commissioner actually made. The substantial evidence test is applied to the entire record; evidence is substantial if a reasonable mind would accept it as adequate to reach a conclusion.

*Armstrong v. State of Iowa Bldgs.*, 382 N.W.2d 161, 165–66 (Iowa 1986) (citations omitted).

## I.

Both parties agree that mere lead exposure does not qualify as an occupational disease while lead intoxication or poisoning does. *See* Iowa Code section 85A.9 (1973) (schedule of compensable occupational diseases including lead poisoning); *McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 190 (Iowa 1980) (legislature removed restrictions in section 85A.8 and eliminated section 85A.9 schedule not to narrow the definition of occupational diseases but broaden it).

Iowa Code section 85A.8 (1987) states:

Occupational diseases shall be only those diseases which arise out of and in the course of the employee's employment. Such diseases shall have a direct causal connection with the employment and must have followed as a natural incident thereto from injurious exposure occasioned by the nature of the employment. Such disease must be incidental to the character of the business, occupation or process in which the employee was employed and not independent of the employment. Such disease need not have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have resulted from

that source as an incident and rational consequence. A disease which follows from a hazard to which an employee has or would have been equally exposed outside of said occupation is not compensable as an occupational disease.

█ To prove the causation element described in this section claimant must show by a preponderance of the evidence (1) the disease is causally related to the exposure to harmful conditions of the field of employment, and (2) the harmful conditions must be more prevalent in the employment concerned than in everyday life or in other occupations. *McSpadden*, 288 N.W.2d at 190.

Frit argues Virgil did not sufficiently prove the causation element as the record reveals Virgil had other illnesses which could have caused the same symptoms and there was a lack of medical expert testimony necessary to prove causation. *See Anderson v. Oscar Meyer & Co.*, 217 N.W.2d 531 (Iowa 1974). However, the record shows the commissioner relied on Frit's own toxicology expert, Dr. Thoman, in concluding Virgil had carried his burden of proof under 85A.8. Dr. Thoman, having full knowledge of the other illnesses, testified Virgil's March 1982 high blood lead levels and the symptoms described indicated Virgil probably suffered from lead intoxication due to lead exposure in the work place during the early part of 1982 and Virgil needed to be placed in a lead-free environment.

The commissioner, acting as fact finder, determined the lead intoxication rather than Virgil's other health problems caused the symptoms and we will not disturb those findings if there is substantial evidence in the record supporting the finding. *See Armstrong*, 382 N.W.2d at 165; *McSpadden*, 288 N.W.2d at 186.

█ Frit apparently feels Virgil must be physically unable to perform the job given to him or exhibit permanent signs of lead intoxication before an occupational disease finding should be made in this case. We do not agree. Medical records and Dr. Thoman's testimony indicate Virgil was advised to work only in a lead-free environ-

ment when his blood lead level was over twice the permissible level. Despite being placed in what Frit considered a "lead-free environment" Virgil's level increased in November 1982.

An employee need not work in an atmosphere until the most severe stage of an occupational disease is reached before he can seek relief under chapter 85A. This testimony taken in conjunction with Virgil's blood lead levels, which decreased when Virgil was wrongfully discharged from Frit and again increased when he returned to Frit for a few days in November, provide sufficient basis to affirm the conclusion Virgil had suffered from lead intoxication caused by his exposure to lead at Frit Industries.

## II.

■ Frit next challenges the commissioner's determination that Virgil sustained an industrial disability of twenty-five percent of his body as a whole. In order to disturb this finding, Frit has the burden of proving the evidence required a different finding as a matter of law. *Klein v. Furnas Electric Company*, 384 N.W.2d 370, 374 (Iowa 1986).

Iowa Code section 85A.4 states:

Disablement as that term is used in this chapter is the event or condition where an employee becomes actually incapacitated from performing the employee's work *or from earning equal wages* in other suitable employment *because of an occupational disease* as defined in this chapter in the last occupation in which such employee is injuriously exposed to the hazards of such disease.

The term disability includes "industrial disability" or loss of earning capacity and is not merely physical or functional disability. *Klein*, 384 N.W.2d at 374; *Armstrong*, 382 N.W.2d at 166. The commissioner correctly considered Virgil's age, education, work experience, adaptability to retraining and any other such factors which would affect his prospects for employability. *McSpadden*, 288 N.W.2d at 184.

Again, the commissioner has the duty to evaluate the testimony bearing on these factors to determine credibility and the de-

gree of industrial disability. *Armstrong*, 382 N.W.2d at 167. In this case the commissioner noted Virgil has not suffered any permanent physical disablement as a result of his former lead intoxication. However, the commissioner also found Virgil had suffered a "loss in earning capacity proximately caused by an occupational disease under chapter 85.A." *See Blacksmith v. All-American, Inc.*, 290 N.W.2d 348, 350 (Iowa 1980).

Virgil is functionally illiterate. The commissioner found Virgil experienced memory loss due to the lead intoxication and had relied heavily on his memory to perform his duties. He also found Virgil had unsuccessfully applied for work on eight occasions since relocating in 1982.

The record supports a finding that Frit was unable to supply a lead-free atmosphere for Virgil as his blood lead level rose during the few days he returned to Frit in November 1982. Virgil has been unable to get medical insurance, in part because of his past exposures to lead. Evidence in the record indicated Virgil should refrain from working in environments where he is exposed to lead which further limits his employment options.

Based on this record, the commissioner could have determined Virgil, while not permanently physically impaired, has suffered economic hardships due to the lead intoxication which justified a finding of twenty-five percent industrial disability.

The lack of physical impairment and the employable skills Virgil does possess, prevents a finding of 100 percent disability as Virgil requested. *See generally Klein*, 384 N.W.2d at 374–75.

We conclude the commissioner's finding of industrial disability is supported by substantial evidence and the district court correctly affirmed the awards granted in the commissioner's decision.

AFFIRMED.

HABHAB, J., takes no part.