DOUG JORN, APPELLANT, V. PIGS UNLIMITED, INC., AND FARM BUREAU INSURANCE COMPANY OF NEBRASKA, APPELLEES.

587 N.W. 2d 558

Filed December 31, 1998. No. S-97-1270.

Todd D. Bennett, of Rod Rehm, P.C., for appellant.

Anne E. Winner, of Keating, O'Gara, Davis & Nedved, P.C., for appellees.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Doug Jorn suffers from reactive airways dysfunction syndrome, an occupational disease which arose out of and in the course of his employment with Pigs Unlimited, Inc., due to long-term exposure to "hog dust." Relying upon our opinion in *Snyder v. IBP, Inc.*, 222 Neb. 534, 385 N.W.2d 424 (1986), the Workers' Compensation Court held that in order to apply the measure of damages for loss of earning capacity, there must first be a permanent physical impairment to the body as a whole. The compensation court found no evidence of a permanent physical impairment and, thus, denied Jorn recovery for loss of earning power or capacity.

## SCOPE OF REVIEW

Regarding questions of law, an appellate court in workers' compensation cases is obligated to make its own determinations. *Gibson v. Kurt Mfg., ante* p. 255, 583 N.W.2d 767 (1998).

In determining whether to affirm, modify, reverse, or set aside the judgment of the Workers' Compensation Court review panel, the higher appellate court reviews the findings of the single judge who conducted the original hearing. *Cunningham v. Leisure Inn*, 253 Neb. 741, 573 N.W.2d 412 (1998).

## FACTS

Jorn worked for Pigs Unlimited from 1976 until he terminated his employment on December 15, 1995. Jorn was responsible for overseeing the entire pig operation, and he, his wife, and one other part-time worker performed all the physical labor. Jorn was paid $1,200 biweekly; he received a housing subsidy, a $50-per-month automobile allowance, free utilities, and life and health insurance; and he earned profit sharing of $1.30 for each pig produced.

The Pigs Unlimited facility consists of four buildings, or "confinements," the first of which houses 400 adult animals. The second building is a farrowing house which houses 80 adult animals and between 400 and 500 piglets. There are also two buildings used as nurseries. One houses 400 to 600 piglets, and the other houses 600 to 800 piglets. An addition onto one of the buildings houses approximately 150 adult animals. The pigs are kept in pens located in each building.

Each confinement contains a static-pressure ventilation system, with fans which draw air in from the outside as needed. Jorn testified that each confinement was small and enclosed, and became humid given the number of animals kept inside. The confinements were often filled with feed dust and gas emitted from the animals' waste. Feed dust was constantly in the air, and Jorn testified that anyone working inside the pens would be brown with dust within an hour.

A mask worn by Jorn filtered out the heaviest portion of the dust. Jorn alleged, however, that he was exposed to chemicals when the animals were sprayed for mange or mites and when they were given medication. Jorn stated that in 1994, he had an increased exposure to dust, fumes, and pig waste, which was attributed to a change in the handling of the manure. At that time, the lagoon into which the manure was dumped was "getting out of control," and a truck was used to haul the manure

away from the site. This disposal procedure required Jorn to have more direct contact with the manure and increased the concentration of manure gases in the buildings.

In the fall of 1994, Jorn sought medical attention because he was experiencing breathing difficulties. He complained to Dr. R.L. Burghart that he was experiencing tightness in his chest, having difficulty breathing on exertion, and coughing up phlegm. Jorn complained of having discomfort when he was inside the pigpens, and at times, he had to go outside because he felt as if he might pass out from choking. Burghart confirmed Jorn's respiratory problems and referred him to Dr. Susanna Von Essen for treatment.

Von Essen's initial recommendation was that Jorn try an improved air-filter mask. When Jorn's breathing did not improve, Von Essen recommended that he stay away from his working environment. Von Essen made a "progress note" in her records stating that Jorn was being treated for "airways disease secondary to hog handling." She noted that Jorn had changed his respiratory protection while working with the hogs approximately 1 month before, but continued to have the same symptoms. Von Essen cautioned Jorn that the best way to alleviate his symptoms would be to go into a different line of work, in which he was not exposed to hog-confinement areas.

Von Essen completed a workers' compensation medical report on December 12, 1996. In this report, Von Essen indicated that Jorn had reached maximum medical improvement, but opined that there was no evidence for a finding of permanent impairment. Von Essen stated that Jorn's reactive airways dysfunction syndrome would likely become symptomatic again if he continued to work in hog confinements. She concluded that vocational retraining would be in his medical best interest.

In January 1995, Jorn was examined by Dr. Jeremiah Donovan because he was feeling tired, fatigued, and listless, and because a prior test revealed that he had an elevated concentration of "ALT" enzymes, which is symptomatic of liver disease. Donovan wrote to Burghart, suggesting that Jorn not be exposed to his work environment for 6 weeks to see whether his enzyme levels would decrease. If Jorn was unable to get out of

the pig business for 6 weeks, Donovan suggested that he be prescribed medication.

On March 13, 1996, Donovan wrote to Ross Smith, a vocational rehabilitation counselor, to inform him that Jorn had taken a temporary hiatus from working inside the hog confinements. He stated:

> In terms of your questions of any physical limitations or restrictions, I believe that he should try to avoid any toxin exposure whether it be inhaled or by direct skin contact. These things that have potential to lead to hepatotoxicity for him may not be toxic for most people in this work environment but certainly something has triggered off a change in his liver and the fact that when he's removed from the workplace his liver tests improve would suggest that it's something in his work environment that he's exposed to. His actual diagnosis then [would] be non-alcoholic steatohepatitis, possibly toxin induced.

Donovan predicted that Jorn might develop cirrhosis of the liver if he continued his exposure to hog confinements. Donovan could not opine that Jorn's exposure to chemicals and the environment at Pigs Unlimited was the sole etiology of his liver disease.

Dr. John Poterucha, of the Mayo Clinic, also evaluated Jorn regarding his liver disease. Poterucha stated that "[t]he question is whether or not his exposure in the hog confinement areas is contributing to [his liver disease]. I explained to him that it is impossible to be sure but would strongly recommend that he be removed from this environment for a period of at least three months."

On January 11, 1997, Burghart concluded that Jorn's liver disease appeared to be the result of long-term exposure to hog dust. He also concluded, to a reasonable degree of medical certainty, that Jorn's industrial asthma and liver disease were caused by, significantly contributed to, aggravated by, and/or a direct result of the hog-confinement employment with Pigs Unlimited. Burghart found that to avoid exacerbation or aggravation of Jorn's condition, Jorn should not have any further exposure to hog dust.

Subsequently, Jorn filed suit against Pigs Unlimited, claiming that he was entitled to workers' compensation benefits because of the medical problems he was experiencing. Jorn's amended petition alleged that he sustained an occupational disease arising out of and in the course of his employment with Pigs Unlimited "when he sustained liver disease and chronic obstructive pulmonary disease from exposure to hog dust."

At the time of the hearing before the trial court, Jorn continued to be treated by Burghart. Jorn testified that he was treating his reactive airways dysfunction syndrome by using inhalers when needed and by staying away from anything that agitated his symptoms. Jorn stated that he continued to have discomfort when exposed to any kind of smoke or dust and that he had trouble breathing upon physical exertion. He alleged that he was "out of air" whenever he performed any type of heavy physical labor. Jorn also testified that since quitting his job with Pigs Unlimited, he had worked as a substitute teacher in the Omaha public school system for 2 weeks, earning $75 per day. At night, he worked as a telemarketer and earned approximately $120 per week.

The trial court found that Jorn had been employed by Pigs Unlimited as a hog-confinement manager and that he suffered an occupational disease arising out of and in the course of his employment. The trial court attributed Jorn's occupational disease to long-term exposure to hog dust, which resulted in reactive airways dysfunction syndrome. The trial court found that the medical evidence did not preponderate in favor of Jorn's liver disease claim.

The trial court determined that Jorn's injury had occurred on December 15, 1995, when Jorn terminated his employment, and that Jorn was entitled to benefits provided under the Nebraska Workers' Compensation Act. It also concluded that there was not sufficient evidence to entitle Jorn to temporary or permanent benefits under the Nebraska Workers' Compensation Act and that Jorn had no periods of temporary total disability through the end of his employment with Pigs Unlimited. The trial court stated that it could speculate that during the term of subsequent employment, Jorn had earned less than while he was working

for Pigs Unlimited, but that there was not sufficient evidence of his earnings to allow a calculation of temporary partial disability. The trial court found that from the evidence it was clear that the physicians had recommended Jorn leave his employment in the hog-confinement business and that he was permanently restricted from returning to such employment because exposure to hog dust would likely cause recurrent symptoms of his reactive airways dysfunction syndrome. Von Essen found no medical evidence of permanent impairment and did not give Jorn a whole-body permanent functional impairment rating. Relying on our opinion in *Snyder v. IBP, Inc.*, 222 Neb. 534, 385 N.W.2d 424 (1986), the trial court found that without a determination of permanent functional impairment, Jorn could not recover for any loss of earning power or capacity.

On appeal to a three-judge review panel, the review panel found no evidence of permanent physical impairment by any of the medical witnesses and affirmed the trial court's determinations.

### ASSIGNMENTS OF ERROR
Summarized and restated, Jorn asserts that the Workers' Compensation Court erred as a matter of law (1) in finding that there was not sufficient evidence to entitle Jorn to permanent partial disability payments; (2) in finding that there must be a physical impairment of the body as a whole to determine the benefits due under the Nebraska Workers' Compensation Act; (3) in finding that Jorn did not have a loss of earning power and, thus, was not entitled to a loss of earning power evaluation, since Jorn was permanently restricted from returning to the hog production industry; and (4) in finding that a permanent restriction such as that assigned to Jorn does not equate to a loss of earning power.

### ANALYSIS
Here, the issue is whether Jorn, who has no medically diagnosed permanent physical impairment, but who has an occupational disease which permanently restricts him from returning to his former work, can recover for any loss of earning power attributable to that occupational disease. This is a question of law. Regarding questions of law, an appellate court in a work-

ers' compensation case is obligated to make its own determinations. *Gibson v. Kurt Mfg., ante* p. 255, 583 N.W.2d 767 (1998).

In our analysis of this issue, we are governed by the following principle: "Earning power" is not synonymous with wages, nor is it synonymous with loss of physical function, but is measured by an evaluation of a worker's general eligibility to procure and hold employment, the worker's capacity to perform the tasks required by the work, and the worker's ability to earn wages in employment for which he or she is engaged or fitted. See, *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996); *Thom v. Lutheran Medical Center*, 226 Neb. 737, 414 N.W.2d 810 (1987); *Scamperino v. Federal Envelope Co.*, 205 Neb. 508, 288 N.W.2d 477 (1980); *Snyder v. IBP, Inc., supra; Underwood v. Eilers Machine & Welding*, 6 Neb. App. 631, 575 N.W.2d 878 (1998).

Neb. Rev. Stat. § 48-151 (Reissue 1993) states:

(3) The term occupational disease shall mean only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment and shall exclude all ordinary diseases of life to which the general public is exposed;

(4) The terms injury and personal injuries shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom. The terms shall include disablement resulting from occupational disease arising out of and in the course of the employment in which the employee was engaged and which was contracted in such employment.

It is undisputed that Jorn suffered an occupational disease which arose out of and in the course of his employment with Pigs Unlimited. Nevertheless, the Workers' Compensation Court did not compensate Jorn for any alleged loss of earning power or capacity. Relying upon our decision in *Snyder v. IBP, Inc.*, 222 Neb. 534, 385 N.W.2d 424 (1986), the trial court held that since Von Essen had concluded that Jorn suffered no permanent impairment of the body as a whole, he was not entitled to be compensated for loss of earning power or capacity. Jorn argues that he has experienced a loss of earning power or capac-

ity as a result of this occupational disease and should, therefore, be compensated for his loss.

In *Snyder*, a meat-industry worker injured his shoulder during the scope of his employment. He was awarded temporary total disability and certain medical and hospital expenses. Snyder had seen several doctors in regard to recurring shoulder pain. One doctor opined that Snyder was in too much pain to really go back to work but that his condition would improve. Another opined that in light of the work he had done during the summer, he could not be having too much trouble with his shoulder. On appeal, we considered whether the Workers' Compensation Court erred in finding that Snyder's disability was not permanent. We interpreted the medical testimony to mean that Snyder suffered no permanent disability and thus affirmed the then Workmen's Compensation Court's finding that Snyder did not have any loss of earning power which could be attributed to his work-related injury.

We held that once it is determined that no permanent disability, that is to say, no permanent physical impairment of the body as a whole, resulted from the subject accident, then it necessarily follows that no loss of earning power or capacity could result from that accident. In other words, unless it could be shown that the person had suffered a permanent physical impairment to the body as a whole, no award could be made for loss of earning power or capacity.

In the present case, the trial court noted that many occupational respiratory diseases can and do manifest during the course of certain types of employment which subsequently restrict an employee from returning to that type of employment. Jorn has an occupational disease which exhibits no permanent impairment, but which will likely reoccur if he returns to his former employment.

If the requirement in *Snyder* applies, Jorn cannot recover for loss of earning power or capacity because there was no evidence introduced which proved that he sustained a permanent physical impairment to the body as a whole. However, as we compare the facts in *Snyder* to the case at bar, we conclude that *Snyder* is distinguishable. The medical evidence established that Snyder sustained no permanent impairment to his shoulder.

Both doctors who evaluated Snyder opined that his injury would improve. Further, Snyder did not have an occupational disease that permanently restricted him from returning to his previous type of employment.

In some regards, occupational diseases are different from injuries to scheduled members. The practical consequence of an occupational disease is that it can result in an impairment of earning capacity even after the disease is no longer symptomatic. The employee who has been trained in one occupation but who cannot return to that occupation because the employee will become sick or disabled if he returns, obviously, must pursue another occupation. That same employee may find it difficult, if not impossible, to obtain a medical opinion that he has suffered a permanent impairment of the body as a whole, since the employee is symptomatic only while at work. When not at work, the employee is asymptomatic and appears healthy.

As we previously noted, "earning power" is not synonymous with wages, but includes the worker's general eligibility to procure and hold employment, the worker's capacity to perform the tasks required by the work, and the worker's ability to earn wages in employment for which he or she is engaged or fitted. See, *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996); *Thom v. Lutheran Medical Center*, 226 Neb. 737, 414 N.W.2d 810 (1987); *Scamperino v. Federal Envelope Co.*, 205 Neb. 508, 288 N.W.2d 477 (1980); *Snyder v. IBP, Inc., supra*; *Underwood v. Eilers Machine & Welding*, 6 Neb. App. 631, 575 N.W.2d 878 (1998). We therefore hold that when an employee sustains an occupational disease in the course of his or her employment, which disease permanently restricts the return to his or her prior type of employment, the employee may recover for proven loss of earning power or capacity without establishing a permanent physical impairment to the body as a whole.

Other courts which have evaluated the permanency of occupational diseases which are symptomatic only when the employee returns to the same work environment have also concluded that the employee has a claim for wage-loss compensation for purposes of workers' compensation.

In *State ex rel. v. Indus. Comm.*, 76 Ohio St. 3d 272, 667 N.E.2d 392 (1996), a worker developed industrial bronchitis due to exposure at work to a caustic soda solution. The worker was subsequently fired for absenteeism and tardiness, and he filed a workers' compensation claim seeking lost wages. It was medically established that the worker suffered from an occupational disease caused by repeated exposure to caustic soda and that the worker had reached maximum medical improvement. The worker was no longer symptomatic, but the doctor expected that the worker would once again have pulmonary symptoms if he were exposed to the caustic soda. The doctor concluded that the best solution from a medical standpoint was to prohibit any exposure to caustic soda mist or vapors.

Compensation for lost wages was denied because the hearing officer found that the worker did not suffer from permanent physical impairment, and therefore, loss of wages was not attributable to his occupational disease. One of the issues on appeal was whether the industrial commission had abused its discretion by denying compensation because the industrial bronchitis had resolved itself. The commission had apparently reasoned that because the worker no longer suffered the symptoms of industrial bronchitis, there was no causal connection between his occupational disease and his claimed wage loss. In reversing the decision, the appellate court concluded that where the medical evidence establishes that the worker's medical condition prohibits a return to his former position of employment and the worker suffers a loss of wages as a result thereof, such worker has a legitimate claim for wage-loss compensation.

In *Dayron Corp. v. Morehead*, 509 So. 2d 930 (Fla. 1987), a machinist developed contact dermatitis as a result of using cutting oils in the course of his employment. At the compensation hearing, the physician testified that the claimant had a permanent sensitivity to the cutting oils and would be unable to work when exposed to them, but would have no permanent impairment if not exposed. Florida law required that there be a finding of permanent physical impairment, as defined in the American Medical Association guidelines, prior to allowing a claimant to recover for economic loss. Even though the guidelines did not characterize the claimant's condition as permanent, the Florida

Supreme Court determined that he suffered from a permanent physical disability. The court noted there was confusion with regard to the terms "impairment" and "disability." The court concluded that "impairment" was a medical assessment, while "disability" was a legal issue. Because Florida statutes provided for compensation for disability and it had already been concluded that the claimant suffered from a permanent physical disability, the court found that the claimant was entitled to compensation even though his illness was not symptomatic if he did not return to his prior working conditions.

Courts which have evaluated loss of wages attributable to an occupational disease which is not perpetually symptomatic but which prohibits the employee from returning to work have concluded that a finding of physical impairment, per se, is not necessary for determination of benefits. Those courts have required that the claimant must prove that the occupational disease caused the loss of wages.

In *Frit Industries v. Langenwalter*, 443 N.W.2d 88 (Iowa App. 1989), a maintenance worker was exposed to a toxic level of lead and developed lead poisoning. Although the claimant's doctor required him to remain off work for 2 weeks, his employer ordered the claimant to return to work or be fired. The claimant did not report to work and ultimately lost his job. At the time of trial, although the claimant was not symptomatic, the compensation court found that he suffered from an occupational disease and was 25-percent industrially disabled.

On appeal, the employer claimed that the compensation court erred in finding the claimant had an industrial disability of 25 percent of the body as a whole. Pursuant to Iowa case law, the term "disability" included loss of earning capacity and not merely physical or functional disability. The appellate court noted that although the claimant had not suffered any permanent physical disability as a result of the former lead intoxication, he had suffered a loss of earning capacity proximately caused by an occupational disease, because the claimant was required to refrain from working in environments where he was exposed to lead. The appellate court concluded that while not permanently physically impaired, the claimant had suffered

economic hardship due to the lead intoxication, which justified a finding of 25-percent industrial disability.

In *Tyndall v. Walter Kidde Co.*, 102 N.C. App. 726, 728, 403 S.E.2d 548, 549 (1991), the claimant developed " 'chronic hand eczema' " from exposure to chemicals and coolants that she used at work as a machinist. Her eczema was exacerbated by chemical exposure and greatly improved when she ceased work. A doctor testified that if the claimant continued to be exposed to the chemicals, she could have problems with eczema for an indefinite period of time. Another physician concluded that the claimant was fully capable of working in another capacity where exposure to these chemicals was not necessary. It was not disputed that the claimant suffered from an occupational disease. Without making a finding of permanent physical impairment, the court concluded that any reduction in her earning capacity was the result of an occupational disease and awarded benefits.

## CONCLUSION

Jorn's occupational disease prevents him from returning to a job which he held for 19½ years. He is permanently restricted from this prior form of employment in that if he returns to it, his respiratory symptoms will likely reappear. For these reasons, we hold that if a claimant suffers from an occupational disease which permanently restricts the claimant from returning to his or her prior type of employment, a finding of a permanent impairment of the body as a whole is not required in order for the claimant to recover any proven loss of earning power or capacity.

The question is what must be done in this case to resolve the issue of whether Jorn has sustained an impairment of earning power or capacity. Initially, there needs to be a determination whether Jorn qualifies for vocational rehabilitation. If Jorn meets such qualifications, then vocational rehabilitation is the next step. Following vocational rehabilitation, if appropriate, the trial court should make a determination of Jorn's impairment of earning power or capacity, if any. Unlike the rule discussed in *Gibson v. Kurt Mfg., ante* p. 255, 583 N.W.2d 767 (1998), a determination of earning capacity should be made fol-

lowing rehabilitation. Whether there has been a reduction of loss of earning power will not depend upon whether there has been a decrease of Jorn's whole-body impairment, since none was assessed.

In the event that Jorn does not qualify for vocational rehabilitation, the trial court should proceed with a determination of whether Jorn has sustained an impairment of earning power.

The judgment of the Workers' Compensation Court is reversed, and the cause is remanded with directions.

REVERSED AND REMANDED WITH DIRECTIONS.

HENDRY, C.J., not participating.