STANLEY GREEN, APPELLEE, V. DRIVERS MANAGEMENT, INC., APPELLANT.
634 N.W. 2d 22

Filed June 26, 2001. No. A-00-1156.

Raymond P. Atwood, Jr., and Ryan C. Holsten, of Atwood & Associates Law Firm, P.C., L.L.O., for appellant.

Steven H. Howard, of Law Offices of Ronald J. Palagi, P.C., for appellee.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

SIEVERS, Judge.

A trial judge of the Nebraska Workers' Compensation Court awarded Stanley Green, a truckdriver, compensation for a back injury he sustained while tightening down cargo onto a flatbed tractor-trailer. Green's award included payments for temporary total disability and permanent loss of earning capacity, and included the opportunity to receive vocational rehabilitation services. His employer, Drivers Management, Inc. (DMI), was also ordered to pay various medical bills. A review panel of the Workers' Compensation Court affirmed the award and assessed attorney fees against DMI, which now appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

Green began working for DMI as a truckdriver in 1994. He worked full time, making deliveries mainly along the east coast, earning approximately $1,000 per week. While making a delivery in Ohio on June 9, 1997, Green was tying down a load of steel bars onto the bed of his tractor-trailer when he "lift[ed] up on the strap ratchet" and "felt a stabbing pain between [his] shoulder blades." He then reported the injury to DMI, who routed him back to New York to see a doctor. During the drive back to New York, Green felt pain in his lower back and numbness in his legs. The next day, Green stopped working for DMI.

Green sought treatment from several physicians in New York following his injury. Dr. Joy Dolorico, Green's first doctor, prescribed muscle relaxants and painkillers. Dr. Dolorico eventually referred Green to several other doctors who prescribed physical therapy, epidurals, pain medication, and antiseizure drugs. DMI asked Dr. Anthony Nastasi to examine Green in October 1997. Dr. Nastasi concluded that he "could find no basis upon which to indicate the [sic] permanent impairment to [Green's] cervical, dorsal or lumbar spines has taken place." According to physical therapy progress reports, Green's condition "plateaued" as of May 20, 1998, but he continued to complain of significant back pain and numbness in his legs.

Green performed a functional capacity assessment on August 17, 1998. The assessment concluded that Green was "capable of working in the heavy work category" based on his performance in lifting, pulling, and agility tests. On September 2, DMI stopped

paying compensation benefits and told Green to report back to work within 30 days. Exhibit 33 contains a copy of two notes by Dr. Dolorico, one of which is dated August 28, and the other September 2, both of which state that Green "can go back to work," with the August 28 note specifically stating that Green "can go back to work at a level of maximum medical improvement."

Green consulted Dr. Arnold Criscitiello, an orthopedic surgeon with whom Green had been treating since June 1998, about the functional capacity evaluation and Dr. Dolorico's release. Dr. Criscitiello advised Green against returning to work until further diagnostic studies could be done. However, Green returned to work for DMI on September 15, 1998. He worked for approximately 2 months driving a truck. On November 17, Green quit work for a second time because, according to Green, the pain increased in his legs and back, and his leg numbness prevented him from safely driving a truck. After an office visit on November 16, Dr. Criscitiello advised Green to stop working and stated that "I don't think that [Green] should be back to full duty work but these are issues that have been overridden [by the functional capacity assessment and independent medical examiners]." During Green's next visit on December 15, Dr. Criscitiello reported that Green was temporarily totally disabled.

Dr. William Stewart examined Green on January 11, 1999, and concluded that Green had not suffered any impairment as a result of the June 1997 accident. On February 9, Dr. Myra Shayevitz examined Green to determine whether Green was eligible for New York disability benefits. The State of New York denied Green disability benefits, but Dr. Shayevitz agreed with Dr. Criscitiello that Green needed further diagnostic tests "to better delineate this problem," and expressed reservation about Green's ability to stand, walk, or climb stairs. Green continued to attend physical therapy and take pain medication throughout 1999. An electrodiagnostic test performed in May 1999 pursuant to Dr. Criscitiello's persistent recommendations indicated nerve root irritation in Green's lower back and carpal tunnel syndrome in his right wrist.

Green petitioned for workers' compensation benefits on March 8, 1999. At trial on Green's petition, the parties stipulated that on June 9, 1997, Green "sustained an accident that arose out

of and in the course of his employment with [DMI]," that Green's average weekly wage at the time of the accident was $988.72, and that DMI had already paid $14,986.82 of Green's medical bills and had paid Green $27,328 for 64 weeks of temporary total disability compensation. A summary of benefits paid shows that DMI started paying temporary total disability on June 11, 1997, and stopped these payments as of September 1, 1998.

Green testified to his employment history, the extent of his back injury, and his loss of earning capacity. At the time of trial, Green was 40 years old, was married, had two teenage daughters, lived with his family in Mexico, New York, had a high school education, had taken a 1,000-hour carpentry course during high school, and held a "CDL." According to Green, his pain and numbness extended from his neck to his legs, feet, arms, and hands. He said he could not drive a truck because he was unable to sit for more than 45 minutes without pain and could not feel his feet depressing the brake pedal because of the numbness in his legs. He stated that he has had "maybe one day" without pain since the June 1997 accident. Prior to his work at DMI, Green had been a communications operator in the U.S. Army for 12 years and had been a truckdriver for Snyder National Carrier for 1½ years. Green testified that there were few jobs in the civilian world requiring the training Green had received in the military. Since he stopped working for DMI in November 1998 (the second and final time he quit at DMI), Green had applied for jobs at Wal-Mart, McDonald's, and a staffing company, but had not received any offers. By subcontracting, he had done some private construction work renovating apartment complexes, earning between $400 and $450 per week, and had plans to start his own home improvement business remodeling and reroofing homes. As of the time of trial, however, he did not have any construction work lined up. He anticipated construction jobs of putting on a steel roof and installing a large bathtub. He stated that he is proficient with many power tools.

The trial judge awarded Green temporary total disability, permanent partial disability, and the opportunity to participate in vocational rehabilitation training. In addition, the trial judge ordered DMI to pay Eckerd Drugs $1,462.55; Empi, Inc., $466.55; and Magnetic Diagnostic Resources $291.76, and

further required that DMI reimburse Green and his health insurance carrier "for payments made related to the above described accident as the interest of each may appear." Other than the aforementioned bills, there is no evidence of any other medical bills which DMI has not paid.

The temporary total disability award of $427 per week, the maximum weekly income benefit available under Neb. Rev. Stat. § 48-121.01 (Reissue 1998), for 77⁶/₇ weeks covered two different time periods. The first time period spanned June 10, 1997, 1 day after Green injured his back, through September 14, 1998, the day before Green returned to work after Dr. Dolorico had advised him to return to work. DMI does not contest that Green was temporarily totally disabled during this time period and has paid all medical expenses through this period of disability. The second time period covered by the temporary total disability award, which DMI does challenge in this appeal, spanned November 19, 1998, after Dr. Criscitiello had advised Green to quit work, through February 9, 1999, when Dr. Shayevitz examined Green to determine his eligibility for New York State disability benefits. The trial court found that Green reached maximum medical improvement on February 9 because the "totality of the evidence demonstrates his medical condition had plateaued."

None of Green's physicians assigned him a permanent impairment rating or gave Green permanent physical restrictions. Nevertheless, the trial judge relied upon Dr. Shayevitz' report, as well as Green's testimony, to find that Green suffered a 50-percent loss of earning capacity as a result of the injury, and therefore awarded Green $329.54 per week for 222¹/₇ weeks. The trial court quoted the portion of Dr. Shayevitz' report relied upon as follows:

"[Green] sits, he has to change his position. I do not believe he can do extensive standing, walking, or stair climbing. He could, perhaps, carry something very light and not frequently. I think that if he started handling small objects rapidly or repetitively, he would probably aggravate whatever process appears to be in the neck."

Additionally, the judge pointed out that Green's ability to lift in the " 'heavy work' " classification, according to the August 1998 functional capacity evaluation, was *trumped* by his testimony

that he tried his hardest during the evaluation, that he was in bed 2 to 3 days after the evaluation as a result of his exertion during the test, and that he could physically lift the weight in the evaluation but could not do so continually.

On April 3, 2000, through an order nunc pro tunc, the trial court included the following text into its award: "The Plaintiff will require additional medical care and treatment for which Defendant is liable." On April 6, DMI appealed the award to a review panel of the Nebraska Workers' Compensation Court. The panel separately addressed only DMI's argument that there was no evidence of a causal connection between Green's condition and his injury. In affirming the award in all respects, the panel found causation present because one of Green's doctors reported that " 'with regards to [Green's] condition, I do think that the injury on 6/9/97 is related to the symptoms that he has.' "

## ASSIGNMENTS OF ERROR

DMI asserts that the Nebraska Workers' Compensation Court exceeded its powers and that there was insufficient evidence supporting the court's award in the following four respects: (1) The court erred in finding that Green suffered a 50-percent loss of earning capacity without evidence of impairment ratings or physical restrictions causally related to Green's injury, (2) the court erred in finding Green temporarily totally disabled from November 19, 1998, through February 9, 1999, (3) the court erred in ordering DMI to pay medical bills which were not offered into evidence, and (4) the court erred in awarding Green vocational rehabilitation services.

Although not assigned as error, DMI's brief contains a subsection arguing that DMI was not afforded meaningful appellate review because the review panel "erred in its failure to address issues brought before it, and its failure to render a reasoned decision under Nebraska Workers' Compensation Court Rule 11." Brief for appellant at 26. However, in the absence of plain error, we consider only those claimed errors which are both assigned and argued, and therefore we will not address the sufficiency of the review panel's decision. See *State v. Salisbury*, 7 Neb. App. 86, 579 N.W.2d 570 (1998). Finally, DMI assigns as error the court's finding that medical bills from Eckerd Drugs; Empi,

Inc.; and Magnetic Diagnostic Resources were reasonable and necessary; however, DMI does not argue this assignment in its brief. Consequently, we will not address DMI's claim that these bills were not "reasonable and necessary."

## STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Owen v. American Hydraulics*, 258 Neb. 881, 606 N.W.2d 470 (2000).

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Miller v. E.M.C. Ins. Cos.*, 259 Neb. 433, 610 N.W.2d 398 (2000). In testing the sufficiency of evidence to support findings of fact made by the Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party and the successful party will have the benefit of every inference reasonably deducible from the evidence. *Id.* An appellate court may not substitute its view of the facts for that of the trial judge if there is competent evidence in the record to support the trial judge's decision. *Owen, supra.*

## ANALYSIS

*Permanent Partial Disability Award.*

Unlike impairments to scheduled members, such as fingers, arms, or eyes, which are compensated on the basis of loss of physical function, impairments of the body as a whole are compensated in terms of employability or loss of earning capacity. *Nordby v. Gould, Inc.*, 213 Neb. 372, 329 N.W.2d 118 (1983); Neb. Rev. Stat. § 48-121 (Cum. Supp. 2000). In the instant case, the trial judge found that Green suffered a 50-percent loss of earning capacity, but did not make a specific finding of impairment and, instead, only commented on the evidence concerning Green's disability. DMI, relying on *Snyder v. IBP, Inc.*, 222 Neb.

534, 385 N.W.2d 424 (1986), argues that the trial judge exceeded her authority in finding a loss of earning capacity when none of Green's doctors had given him a permanent impairment rating and when there was no medical evidence that Green had permanent physical restrictions. In short, DMI argues that either impairment ratings or permanent physical restrictions are prerequisites to an award for loss of earning capacity. On the other hand, Green argues that specific impairment ratings are not required in body as a whole cases. In *Snyder*, the Supreme Court delineated what proof a claimant must adduce to show that his or her body as a whole is permanently impaired.

In *Snyder*, David J. Snyder, a meatpacker, injured his shoulder while he was pulling meat from a bone at work. Snyder was awarded temporary total disability and certain medical expenses. He saw several doctors about his recurring shoulder pain. One doctor opined that Snyder had too much pain to return to meatpacking but that his condition would improve. A second doctor opined that Snyder could not be having too much trouble with his shoulder, given the construction and concrete work Snyder had done after his injury occurred. A third doctor opined that Snyder had no permanent disability as of Snyder's last visit with the doctor. The court interpreted the medical testimony as meaning that Snyder had not suffered a permanent disability. Snyder countered that regardless of his physical condition, the evidence showed he had suffered a loss of earning power. In rejecting this argument, the court in *Snyder* ruled that "once it is determined that no permanent disability, that is to say, no permanent impairment of the body as a whole, resulted from the subject accident, then it necessarily follows that no loss of earning power can result from that accident." 222 Neb. at 537, 385 N.W.2d at 427. Thus, *Snyder* stands for the proposition that there can be no award for loss of earning capacity in the absence of proof of permanent physical impairment to the body as a whole.

Similar to Green's situation in the instant case, in *Jorn v. Pigs Unlimited, Inc.*, 255 Neb. 876, 587 N.W.2d 558 (1998), there was no evidence that Doug Jorn, a hog farmer with respiratory problems, sustained permanent impairment to the body as a whole. Based on its holding in *Snyder, supra,* the court in *Jorn* recognized that Jorn could not recover for loss of earning power with-

out some evidence that he had sustained a permanent impairment. However, the court found *Snyder* distinguishable from Jorn's case because Jorn had an "occupational disease," which, unlike Snyder's shoulder injury or a scheduled member injury, "can result in an impairment of earning capacity even after the disease is no longer symptomatic." *Id.* at 885, 587 N.W.2d at 564. Therefore, *Jorn* carved out an exception to the requirement in *Snyder* of proof of permanent impairment to the body as a whole and held that when an employee sustains an occupational disease in the course of his or her employment, which disease permanently prevents the return to his or her prior type of employment, the employee may recover for proven loss of earning power or capacity without establishing a permanent physical impairment to the body as a whole. Thus, *Jorn* clearly reaffirmed *Snyder*'s requirement of proof of permanent impairment unless a claimant suffers from an occupational disease which prevents returning to former employment. We would suggest that *Jorn* likely has limited application to what can be called an "exposure" case, i.e., where the workplace environment contains substances which trigger symptoms which are resolved by avoidance of the offending workplace. Here, neither party claims, nor is there any evidence, that Green suffers from an occupational disease.

Green argues that *Snyder v. IBP, Inc.*, 222 Neb. 534, 385 N.W.2d 424 (1986), is inapplicable because the court in *Snyder* affirmed the denial of loss of earning capacity, while in this case, DMI is asking us to reverse an award for loss of earning capacity. Therefore, Green argues that DMI has an insurmountable burden of proof to show that the trial court improperly "measure[d]" Green's loss of earning capacity. Brief for appellee at 9. However, Green confuses evidence which tends to prove that there is a loss of earning capacity (such as a claimant's ability and capacity to procure employment and do the required work) with the prerequisite that there first be evidence of permanent impairment before the extent of permanent disability even becomes an issue to be decided. *Snyder* requires that there be evidence of both.

If the nature and effect of a claimant's injury are not plainly apparent, then the claimant must provide expert medical testimony showing a causal connection between the incident and

injury, as well as any claimed impairment after the injury. See, *Frank v. A & L Insulation*, 256 Neb. 898, 594 N.W.2d 586 (1999); *Fees v. Rivett Lumber Co.*, 228 Neb. 617, 423 N.W.2d 483 (1988). See, also, *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999) (subjective injuries from claimed medical malpractice presented complicated question requiring expert testimony). We hold that unless a worker suffers *impairment* of the body as a whole, a worker with a body as a whole injury cannot be compensated for claimed *disability* to the body as a whole. See *Snyder, supra*.

The law is similar in personal injury actions. A prerequisite to tendering an opinion on loss of earning capacity is medical evidence of permanent impairment. See, *Snyder v. EMCASCO Ins. Co.*, 259 Neb. 621, 611 N.W.2d 409 (2000) (vocational rehabilitation counselor's opinion on loss of earning capacity properly admitted because there was medical evidence of permanent impairment caused by injuries sustained in automobile accident); *Phillips v. Industrial Machine*, 257 Neb. 256, 597 N.W.2d 377 (1999) (vocational rehabilitation counselor's opinion on loss of earning capacity improperly admitted because witness assumed that plaintiff was disabled without any medical evidence to substantiate assumption).

The operative rule is that while the compensation court may rely on a claimant's testimony in determining the degree of disability suffered without expert testimony, *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996), the court may not rely solely on a claimant's testimony for evidence of a permanent impairment to the body as a whole when the injury is subjective in nature. See, *Frank, supra*; *Fees, supra*. This brings us to the crucial distinction between disability and impairment.

At the outset, we suggest that virtually every lawyer, doctor, trial judge, and appellate judge (author included) who has dealt with workers' compensation cases commits the sin of failing to consistently recognize the distinction between impairment and disability by using the terms appropriately rather than interchangeably. Doctors testify about an injured person's "disability" when they should speak of impairment. We write about impairment when we really are concerned with disability. Speaking broadly, impairment is typically a medical concept—

what physical abilities have been adversely affected by the injury—whereas disability involves the question of how the injury affects the ability to get and perform work. See, *Phillips*, 257 Neb. at 278, 597 N.W.2d at 392 (Gerrard, J., concurring) (" '[p]ermanent medical impairment is related directly to the health status of the individual, *whereas disability can be determined only within the context of the personal, social, or occupational demands, or statutory or regulatory requirements that the individual is unable to meet as a result of the impairment*' " (emphasis in original), quoting *Marnette v. Morgan*, 485 N.W.2d 595 (S.D. 1992)); *Gibson v. Kurt Mfg.*, 6 Neb. App. 371, 573 N.W.2d 786 (1998) (impairment is limitation on what body can do and loss of earning capacity is what individual, considering his or her various strengths and weaknesses, can earn in marketplace), *overruled on other grounds* 255 Neb. 255, 583 N.W.2d 767 (1998).

Doctors performed various diagnostic tests on Green and took x rays and MRI's of his back and spine. These tests show that Green may have disk herniation, minor disk bulging, or degenerative disk disease. Green's symptoms were pain throughout most of his body and numbness in his legs. Green's doctors and therapists reported that Green told them that he did not have these symptoms prior to his June 1997 injury. In December 1998, Dr. Criscitiello opined that Green's injury "is related to the symptoms that he has." Dr. Shayevitz opined that Green cannot "do extensive standing, walking, or stair climbing" and that repetitive handling of small objects "would probably aggravate whatever process appears to be in [Green's] neck." There is only the one report from Dr. Shayevitz in the record.

Citing Dr. Shayevitz' report, the evidence of a herniated lumbar disk, Green's failed attempt to return to work, and his own testimony regarding what he cannot do and his lack of improvement, Green argues that we should not tamper with the trial judge's factual finding of loss of earning capacity because the record contains sufficient evidence of Green's physical restrictions.

However, Green still must carry his burden of proof. The record does not have any evidence that Green suffered a *permanent impairment* to his body as a whole. Simply put, Dr. Shayevitz' belief that Green cannot "do extensive standing,

walking, or stair climbing" is not expressed as a permanent physical restriction, nor does she say that these limitations were caused by Green's June 1997 injury. Dr. Shayevitz characterized Green's injury as an unidentifiable "process" in Green's neck and opined that Green probably had cervical spine disease which was causing his back pain. These ambiguous statements hardly constitute evidence of permanent impairment. Even though "magic words" such as reasonable medical certainty are not required, see *Owen v. American Hydraulics*, 258 Neb. 881, 606 N.W.2d 470 (2000), Dr. Shayevitz' report, when examined in its entirety, fails to establish the crucial causal link between the accident and the limitations. And we recall that several other doctors reported that Green had not suffered any permanent impairment at all. No medical expert gave Green an impairment rating. Moreover, Green's repeated statements to medical providers that his pain and numbness did not occur until after the June 1997 accident do not provide sufficient proof of permanent physical impairment because they merely constitute statements about his subjective condition. While pain alone could constitute a permanent impairment, see, e.g., *Snyder v. EMCASCO Ins. Co.*, 259 Neb. 621, 611 N.W.2d 409 (2000), and *Castro v. Gillette Group, Inc.*, 239 Neb. 895, 479 N.W.2d 460 (1992), none of Green's doctors opined that Green suffered permanent impairment because of his pain and numbness. Green's testimony concerning what he cannot do because of his pain and numbness is relevant evidence, but unless accompanied by medical evidence of impairment, it is insufficient to prove permanent impairment of his body as a whole, and a finding to the contrary is clearly wrong. See *Evans v. Gear Drilling Co.*, 197 Neb. 841, 251 N.W.2d 173 (1977) (where claimant's principal complaints were pain and dizziness, there was no medical evidence that these symptoms were permanent if they existed and where only medical evidence in record showed that claimant sustained no permanent disability, 5-percent disability to body as whole was not supported by evidence). Finally, while MRI's and x rays of Green's spine may show disk herniation or bulging, there is no evidence that Green's accident caused these conditions, that they are the source of Green's pain, or that they are permanent conditions.

In summary, Green had the burden of proving that his "subjective" injury caused permanent impairment of his body as a whole as a predicate to an award of permanent disability, i.e., loss of earning capacity. Given the evidence in the record, and the evidence that is not, we recall that a workers' compensation award cannot be based on mere possibility or speculation, and if an inference favorable to the plaintiff can only be reached on the basis thereof, then he or she cannot recover. *McMichael v. Lancaster Cty. Sch. Dist. 001*, 233 Neb. 603, 447 N.W.2d 35 (1989). Under the evidence presented in this case, it would be sheer speculation to assign Green a 50-percent permanent partial disability. Thus, the trial judge clearly erred in awarding Green a 50-percent loss of earning capacity, and the review panel erred in affirming this award in the absence of any medical evidence of impairment. Therefore, we reverse, and vacate that award.

*Award of Vocational Rehabilitation Services.*

The trial judge ruled that Green was entitled to receive vocational rehabilitation benefits because he was unable to perform work for which he has previous training. DMI assigns as error the trial judge's reliance on Dr. Shayevitz' opinion in awarding vocational rehabilitation services. DMI incorrectly asserts that Green was awarded rehabilitation services because Green was given only the *opportunity* to receive services—the award of vocational rehabilitation was conditioned upon, among other things, Green's getting a suitability evaluation within 30 days of the award. Nonetheless, the issue is squarely presented as to whether Green's award for vocational rehabilitation may stand when he has reached maximum medical improvement but has no permanent disability.

In *Snyder v. IBP, Inc.*, 222 Neb. 534, 537, 385 N.W.2d 424, 427 (1986), an award of vocational rehabilitation was reversed, the court holding that "vocational rehabilitation can be ordered only where, among other things, the employee 'is entitled to compensation for total or partial disability which is or is likely to be permanent . . . .' " The *Snyder* court relied on the version of § 48-162.01 then in effect, which provided that vocational rehabilitation could only be awarded if a worker's total or partial disability "is or is likely to be permanent" and if there

was a reasonable probability that such rehabilitation would help restore the worker to gainful employment. See § 48-162.01 (Reissue 1988). However, this language was omitted when the statute was amended in 1993. After the amendment, vocational rehabilitation benefits as may be reasonably necessary to restore the worker to gainful employment are properly awarded when an injured employee is unable to return to the work for which he or she has previous training or experience. § 48-162.01 (Reissue 1998); *Collins v. General Casualty*, 258 Neb. 852, 606 N.W.2d 93 (2000). Because there is now no requirement in § 48-162.01 that an injured worker have permanent disability to be eligible for vocational rehabilitation benefits, our reversal of Green's permanent partial disability award does not affect the award of vocational rehabilitation.

The trial judge specifically found that Green "is unable to perform work for which he has previous training or experience," a determination which will not be disturbed unless clearly erroneous. *Haney v. Aaron Ferer & Sons*, 3 Neb. App. 14, 521 N.W.2d 77 (1994). This finding is not clearly erroneous, and therefore the award of vocational rehabilitation is affirmed.

*Temporary Total Disability.*

DMI asserts that Green was not entitled to an award of temporary total disability for the time period between November 19, 1998, through February 9, 1999. DMI argues that Green was not given any work restrictions or limitations during this time period and, in fact, was physically able to perform many jobs, as evidenced by his own admission that he was not totally disabled, that he had applied for employment at several businesses, and that he had performed construction work at apartment complexes.

Temporary disability contemplates the period the employee is submitting to treatment, is convalescing, is suffering from the injury, and is unable to work because of the accident. *Uzendoski v. City of Fullerton*, 177 Neb. 779, 131 N.W.2d 193 (1964). Total disability does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform, or any other kind of work which a person of his or her mentality and attainments could

do. *Mata v. Western Valley Packing*, 236 Neb. 584, 462 N.W.2d 869 (1990). Whether an injured worker is totally disabled is a question of fact which may be reversed upon appeal only if the finding of the Workers' Compensation Court is clearly wrong. *Id.*

Here, the trial judge found that Green was temporarily totally disabled on November 19, 1998, and reached maximum medical improvement on February 9, 1999. When viewed most favorably to Green, the record shows that on November 16, 1998, Dr. Criscitiello, who had been treating Green since June, advised Green to quit work at DMI until further diagnostic tests could be performed. Green quit work at DMI on November 17 because of continuing pain in his legs and back and because of his inability to feel the brake pedal of his truck due to numbness in his legs. After examining Green on December 18, Dr. Criscitiello concluded that Green was temporarily totally disabled and was "not capable of working in any capacity at this time." Thus DMI's claim that Green was given no work limitations is not accurate. On February 9, 1999, Dr. Shayevitz concluded that Green could carry only light objects, and infrequently at that. During this time period, Green was taking three different pain medications and using a "TENS unit." There is competent evidence that Green could not drive a truck during this time period due to his symptoms. His admission during trial that he did not consider himself totally disabled does not disqualify him as a matter of law, but merely is a matter for the fact finder to consider. The record is unclear as to when he applied for work at Wal-Mart, McDonald's, and the staffing company. Application for work at an unknown time is just another fact to be considered. Green's plans to begin his own construction business did not originate until September 1999, well after the period in question. In sum, there is competent evidence supporting the trial judge's decision that Green was temporarily totally disabled from when Dr. Criscitiello said Green should not work in November 1998 until Dr. Shayevitz examined Green in February 1999. Therefore, this assignment has no merit.

*Past and Future Medical Bills.*

The trial judge ordered DMI to reimburse Green and his health insurance carrier "for payments made related to [Green's

June 1997 injury]" and later added through a nunc pro tunc order that DMI was liable for Green's "additional medical care and treatment." DMI argues that this order was incorrect as a matter of law because Green did not offer any outstanding medical bills from his health insurance carrier into evidence. Additionally, DMI argues that the trial judge should have limited the award of future medical care to injuries causally related to Green's June 1997 accident.

 An employer is liable for all reasonable medical services, as and when needed, which are required by the nature of the injury and which will relieve pain and hasten the employee's restoration to health and employment. *Castro v. Gillette Group, Inc.*, 239 Neb. 895, 479 N.W.2d 460 (1992); Neb. Rev. Stat. § 48-120 (Reissue 1998). The burden of proof is upon the workers' compensation claimant to establish by a preponderance of the evidence that medical services received are causally related to the injury, reasonable and necessary to relieve pain or restore health, and charged fairly. See *Parrish v. Karl Kehm & Sons Contractors*, 186 Neb. 252, 182 N.W.2d 422 (1970).

Here, Green offered no evidence of outstanding medical bills or bills which his health insurance carrier had paid, but which should be paid by his employer, or its insurer, because they were incurred as a result of his June 1997 injury. Because of the lack of evidence and the vagueness of the trial judge's order which would require one to speculate about what is required, we vacate that portion of the award. See *Lenz v. Lenz*, 222 Neb. 85, 382 N.W.2d 323 (1986) (judgment must be sufficiently certain in its terms so that it can be enforced in manner provided by law).

An order requiring an employer to pay expenses "related to" a compensable injury does not accurately reflect the requirement that such expenses be reasonable, necessary, and causally related to the injury. Thus, as for future medical bills, Green is only entitled to reimbursement for medical expenses which he can show by a preponderance of the evidence to be causally related to his June 1997 injury, reasonable and necessary to relieve his pain or restore his health, and charged fairly. Accordingly, the trial judge's overly broad award of future medical benefits is incorrect as a matter of law and is vacated.

## CONCLUSION

The trial judge erred in awarding Green permanent partial disability benefits and in ordering DMI to pay for medical bills not offered into evidence. When the review panel affirmed the trial judge's award, it ruled that Green was entitled to an attorney fee of $1,500 with interest because DMI failed to obtain a reduction in the total award. See Neb. Rev. Stat. § 48-125 (Cum. Supp. 2000) (on appeal award of attorney fees proper only when award is reduced). Green was not entitled to compensation for loss of earning capacity. Therefore, the panel should have reduced the total award, which naturally means the award of fees against DMI must be vacated as erroneous.

Thus, we reverse the panel's award of attorney fees and reverse and vacate the award of $329.54 per week for 222½ weeks for permanent partial disability. We reverse, and vacate as detailed herein with respect to medical expenses. In all other respects, the award is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND VACATED.