IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

FONT V. JBS USA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IVETTE CLEMENTE FONT, APPELLEE AND CROSS-APPELLEE,

V.

JBS USA, L.L.C., APPELLANT, AND STATE OF NEBRASKA WORKERS'
COMPENSATION TRUST FUND, APPELLEE AND CROSS-APPELLANT.

Filed March 30, 2021.    No. A-20-025.

Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed.

Charles L. Kuper, of Larson, Kuper & Wenninghoff, P.C., L.L.O., for appellant.

Lee S. Louden and Joseph A. Huckleberry, of Law Office of Lee S. Louden, P.C., L.L.O., for appellee Font.

Douglas J. Peterson, Attorney General, and Amanda M. Phillips for appellee State of Nebraska Workers' Compensation Trust Fund.

BISHOP, ARTERBURN, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

JBS USA, L.L.C. (JBS), appeals, and the State of Nebraska Workers' Compensation Trust Fund (Trust Fund) cross-appeals, the Workers' Compensation Court's order entered on December 23, 2019, awarding vocational rehabilitation services to Ivette Clemente Font. We affirm.

## II. BACKGROUND

### 1. NOVEMBER 28, 2016, INJURY

Font, also referred to as Clemente in the record, began working for JBS in July 2016. When she applied to JBS, she represented that she was capable of doing "medium work," meaning work that required her to push or pull or lift up to 26 to 50 pounds occasionally. She began working in the "intestine department." On November 28, while performing her job of "reach[ing] out and grab[bing] the stomach of the [cow carcass as it came down a conveyor line], pull[ing] it [towards her] with her left hand and cutting it with her right," she "felt a pop and heard a crack in her right shoulder and neck." Upon medical examination immediately following her injury, Font was provided temporary work restrictions. Thereafter, she saw several doctors and underwent physical therapy under the primary complaint of severe pain in her right shoulder. Throughout this period, Font reported additional pain in her neck, back, and left shoulder, however the examining doctors believed this pain to be independent of the injury on November 28. On April 3, 2017, Font underwent a right shoulder arthroscopy with subacromial decompression and partial clavicle excision; she still reported pain and limited range of motion in her right shoulder thereafter.

Following her recovery from surgery, Font returned to work for JBS in a less strenuous capacity on May 16, 2017, working as a "bagger" with restrictions of using her left arm. Font filed a petition in the Workers' Compensation Court on June 30 for the injuries she sustained on November 28, 2016. She was subsequently laid off in August 2017 because "they couldn't find a low restriction job for [her]."

On October 31, 2017, the compensation court entered an order on the issue of whether a vocational rehabilitation counselor should be appointed. The court noted Font's right shoulder injury had been assigned a 5-percent impairment rating at that time, and also noted Font's complaints of neck and left shoulder pain. The compensation court concluded, "A vocational rehabilitation counselor should be appointed to begin the assessment and/or evaluation to determine what, if any, vocational rehabilitation services [Font] is entitled to." It further stated:

> In any assessment or evaluation the counselor has an interview with the injured employee, researches medical records, including past medical records and/or treatment. The vocational rehabilitation counselor also obtains a history of [Font's] prior employment and the requirements of that employment. Additionally, a vocational counselor reviews the injured employee's academic qualifications to determine if the employee has the qualifications to proceed with training and perform positions in the employee's particular labor market. That may require testing. All of the above must occur before a vocational rehabilitation plan can be prepared. For this reason, this basic evaluation should proceed forthwith so that once [Font] reaches maximum medical improvement, a recommendation may be made on [Font's] options for future employment, and the preparation of a vocational rehabilitation plan. . . .

> All of the above can be accomplished prior to the preparation of a plan, therefore, the evaluation and/or assessment should begin now and a plan prepared later.

> [Font] has a 5 percent permanent impairment and has not returned to work. The vocational rehabilitation process should begin.

The compensation court ordered that a vocational rehabilitation counselor be appointed to perform the initial steps to prepare a rehabilitation plan.

A functional capacity evaluation (FCE) measuring Font's employment limitations was conducted on November 28, 2017. She was called back to work at JBS in January 2018, and she was given "new restrictions of being sedentary or seated" and she started a new job in the laundry department organizing or pairing gloves. JBS then terminated her post in March; Font was told that if her restrictions changed in the future and they could be accommodated, then she "might have a job with them again." Font never returned to work at JBS.

## 2. MARCH 1, 2019, INITIAL AWARD

Trial was held on July 10, 2018. Font, age 47 at the time of trial, testified with the help of an interpreter. Her medical records and the reports and opinions of the doctors who examined her case were entered into evidence. Preceding the commencement of trial testimony, Font's attorney informed the court that in accordance with the October 31, 2017, order, Amanda Ruhland was appointed as the vocational rehabilitation counselor to perform an initial evaluation, "[b]ut because the parties could not agree on what the permanent restrictions are, no vocational plan has been prepared or submitted to the Court." The compensation court noted that

> there is a disagreement on the shoulder as to if there are any restrictions or not. There is that disagreement, and it's the shoulder itself. Because that makes a difference on whether or not I send her out to a plan . . . if she needs one. So, make that record. And I'll listen closely. But I'm having a problem with the restrictions or no restrictions. I may ask for some help on that.

The record reflects that the compensation court was aware there was disagreement between the parties on the issue of whether Font had any permanent restrictions. We now briefly summarize the evidence adduced at trial and the findings of the Workers' Compensation Court pertinent to the issues raised on appeal.

Font testified that she had a "lot of pain" in her right shoulder at the time of trial and that she could not reach above her head without right shoulder pain. She indicated that her right shoulder bothered her when lifting things and that she could only lift under 5 pounds. Pushing and pulling with her right arm also was painful. Font claimed that based on her right shoulder and neck pain, she did not feel she could perform any of the jobs she held before she worked at JBS.

The compensation court issued its initial award on March 1, 2019. The court noted that the parties agreed Font was employed by JBS when the injury occurred on November 28, 2016, and that her average weekly wage was $678.33; the court accepted the agreement.

Upon consideration of Font's testimony and the medical records and reports entered into evidence, the compensation court found that Font "injured her right shoulder, had surgery, and has an 11 percent loss of use of her right arm" as a result of the accident on November 28, 2016. Despite the earlier acknowledgement that permanent restrictions were at issue, the court did not make a finding as to permanent restrictions regarding Font's right shoulder.

The compensation court additionally found that Font "suffer[ed] a neck sprain which healed, and for which requires no additional treatment at this time, that is the responsibility of [JBS]." The court noted that "[t]oo many examinations found no complaints of neck pain and full

range of motion." The court determined that Font was "entitled to $452.22 per week for temporary benefits during the period of April 3, 2017[,] through May 15, 2017, and 24.75 weeks of permanent benefits for an 11 percent impairment of the right upper extremity." The court ordered that Font was entitled to future medical care for her right shoulder injury. The award also provided that Font was "entitled to a vocational rehabilitation evaluation[,]" and gave her 45 days "to contact the vocational rehabilitation section of the Court[.]" Referring back to that determination, it ordered that Font was "entitled to vocational rehabilitation services as more specifically set forth above." The court credited JBS for all benefits paid until the date of trial and awarded Font $950 in attorney fees. Neither party appealed the compensation court's award.

### 3. MAY 21, 2019, ORDER REGARDING VOCATIONAL REHABILITATION

Font thereafter filed a motion to compel vocational rehabilitation on May 8, 2019, claiming that following the compensation court's March 1 award, she notified the court's vocational section on March 5 that she wanted vocational services. There had been correspondence between the parties and the vocational rehabilitation counselor, Ruhland, where Ruhland informed the parties she could not "move forward with the development of a VR Plan without agreed upon restrictions or specified restrictions set forth by a judge."

In response to the motion, the compensation court issued an order on May 21, 2019, which was directed to Ruhland. At the outset, the order provided that "[t]he main purpose of vocational rehabilitation is to enable the injured employee to return to work at a full time position which pays as much, if not more, than the employee earned at the time of injury." The court provided an inexhaustive list of factors to be considered in formulating an appropriate vocational rehabilitation plan, including, how the employee presents herself; education and/or intellectual capacity; ability to communicate and/or follow instructions; ability to read, write, speak, and understand English; ability to do what she did at the time of the accident; loss of use of any bodily function; employee's statement about what she believes she can or cannot do; and positions in the local economy for which the employee is qualified for and/or can be retrained to perform. The court then stated that "[w]hile restrictions from doctors and other healthcare providers are to be considered, restrictions are not the sole factor in determining an appropriate vocational rehabilitation plan. Restrictions are only one of a myriad of factors to be considered by the vocational rehabilitation counselor, only some of which are set forth above."

Subsequently, a vocational rehabilitation plan was developed using the restrictions set forth in the FCE offered at trial, even though those restrictions had not been adopted by the compensation court in its March 2019 award. Because the March award contained no finding of permanent restrictions, JBS requested a plan based on no restrictions. However, no such plan was developed.

The drafted plan called for Font to pursue an Associate of Applied Science Degree in Business Technology following completion of ESL coursework and attaining a GED. This plan was denied by the Vocational Rehabilitation Section in September 2019. Because vocational rehabilitation services were in dispute, the Trust Fund was added as a defendant in November.

## 4. December 23, 2019, Order Approving Vocational Rehabilitation Plan

The compensation court held a hearing on December 13, 2019, concerning the adoption of the proposed vocational rehabilitation plan. At that hearing, the court stated, "Restrictions -- restrictions may or may not be considered on a loss of earning power but I also ruled that [Font] is entitled to voc rehab because she's not back at her old job and probably can't do it -- can't do her old job." In that same hearing, the court asked Ruhland the following line of questions:

Q [Court]. If someone has a loss of the arm, do they have any restrictions?

A [Ruhland]. I have no idea. That's not my area of expertise.

Q. Well, let's assume they don't --

A. Assume someone --

Q. -- because there is no arm to use?

A. Yeah.

Q. All right. So if you would have a loss of use of the arm, a partial loss of the use, that would limit your ability to use the arm, wouldn't it?

A. It would.

Q. And one could have that loss of use without restrictions?

A. They could.

Q. But they couldn't do what they did before because they have a loss of use?

A. True.

The court later remarked that "you're all hung up on restrictions but obviously if a doctor says a person has 11 percent loss of use, is that arm as good as it was before?" The court stressed that at the initial trial, Font did not testify about restrictions. It further noted,

[Font] testified about the inability of what she could do. That's a loss of use. A loss of use is not necessarily a restriction and that's the problem I see here. Everybody says this loss of use is a restriction. If you don't have a restriction but you can't use your arm anymore because you have a loss of use.

The court again later stated, "[Font] doesn't have any restrictions, she only has loss of use." Font subsequently testified, as she did at the initial trial, that her right shoulder is painful and she cannot lift her arm past her chest and it hurts when she lifts something with her right arm below chest level.

The compensation court entered an order on December 23, 2019, adopting the proposed plan with amendments. The court found again that Font had "an impairment resulting in an 11 percent loss of use of her right arm" and that such a loss of use entitled her to vocational rehabilitation services. The court expressly found that "[w]hile [F]ont has no formal restrictions, that does not deny her the right to vocational rehabilitation benefits[,]" and [v]ocational rehabilitation benefits usually result in an evaluation and preparation of a plan." The court added, "While the vocational rehabilitation plan may be more difficult to prepare because there are no restrictions, [Font] remains entitled to the preparation of and approval of a plan, because of a loss of use of an arm." In support of its decision, the court cited to *Green v. Drivers Mgmt., Inc.*, 263

Neb. 197, 639 N.W.2d 94 (2002), for the proposition that "an employee is entitled to vocational rehabilitation benefits as a result of an injury which results in impairment or restrictions." The court explained, "When one has a loss of use of a member resulting in the member not being able to function as it used to and limiting the use of that member to engage in employment activities, then one has an impairment and is entitled to vocational rehabilitation services."

The plan adopted by the compensation court entailed completion of ESL coursework and job placement for part-time employment, requiring Font to "participate in the plan to find part-time employment and . . . make a reasonable effort to find part-time employment" as she was completing the ESL courses. Following completion of the ESL coursework, Font would take a test to determine if obtaining a GED would be necessary for her to attend classes at Central Community College. The nature and scope of her education at Central Community College would depend on either agreement between the parties or further hearing by the compensation court upon application of either party.

JBS appealed, and the Trust Fund cross-appealed, the compensation court's December 23, 2019, order approving the vocational rehabilitation plan, as amended.

## III. ASSIGNMENTS OF ERROR

JBS claims the compensation court erred (1) "as a matter of law and fact by providing for vocational rehabilitation services[,]" and (2) adopting the vocational rehabilitation plan developed by the court-appointed vocational rehabilitation counselor.

The Trust Fund contends on cross-appeal that (1) the compensation court erred by disregarding the first part of the two-part test for eligibility of vocational rehabilitation benefits, (2) the compensation court's March 2019 award and December order violated Rule 11 of the Nebraska Workers' Compensation Court Rules of Procedure, and (3) the compensation court erred in shifting the responsibility of making factual findings regarding disability to the court-appointed vocational rehabilitation counselor.

## IV. STANDARDS OF REVIEW

Before reaching the legal issues presented for review, it is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties. *Loyd v. Family Dollar Stores of Neb.*, 304 Neb. 883, 937 N.W.2d 487 (2020). A jurisdictional issue that does not involve a factual dispute presents a question of law, which an appellate court independently decides. *Id.*

Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp. 2018), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Aboytes-Mosqueda v. LFA Inc.*, 306 Neb. 277, 944 N.W.2d 765 (2020).

On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.* In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, an appellate court considers the evidence in the light most favorable to the

successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence. *Id.*

As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.*

## V. ANALYSIS

### 1. APPELLATE JURISDICTION

Before reaching the legal issues presented for review, it is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties. *Loyd v. Family Dollar Stores of Neb., supra.* JBS' first assigned error claims that the compensation court erred as a matter of law and fact by providing Font with vocational rehabilitation services. Font argues that this court does not have jurisdiction over this assigned error because JBS failed to appeal the March 1, 2019, award which found that Font was entitled to such services. Because the March award was a final, appealable order, Font contends that JBS waived its right to contest Font's entitlement to such services by failing to timely appeal the initial award.

We agree with Font that the March 2019 award was a final, appealable order, from which no one appealed. However, we disagree with Font's suggestion that the finality of that award precludes an appeal of the vocational rehabilitation plan subsequently submitted and approved by the compensation court in December 2019, which is at the heart of JBS' appeal and the Trust Fund's cross-appeal.

There are three types of final orders which may be reviewed on appeal, one of which is an order that affects a substantial right made during a special proceeding. *Id.* Because workers' compensation proceedings are special proceedings, the issue is whether the court's order is final. *Id.*

In a special proceeding, an order is final and appealable if it affects a substantial right of the aggrieved party. *Id.* An order affects a substantial right if it affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant prior to the order from which he or she is appealing. See *id.* When multiple issues are presented to a trial court for simultaneous disposition in the same proceeding and the court decides some of the issues, while reserving other issues for later determination, the court's determination of fewer than all the issues is an interlocutory order and is not a final order for the purpose of an appeal. *Jacobitz v. Aurora Co-op*, 287 Neb. 97, 841 N.W.2d 377 (2013).

The compensation court's March 2019 award stated that Font was entitled to temporary and permanent benefits, future medical care for her right shoulder injury, vocational rehabilitation services, and a reasonable attorney fee. With respect to the vocational rehabilitation services, the compensation court ordered that Font was "entitled to a vocational rehabilitation evaluation." The court additionally ordered JBS to pay unpaid medical bills and Font's mileage and gave credit to JBS for all payments previously made to Font. Neither party appealed. Even JBS acknowledges that no appeal was taken from that award and "it became binding on both parties[.]" Brief for appellant at 15. JBS further acknowledges that the March 2019 award "addressed all the issues raised and did not reserve any issues for later determination." *Id*. at 14.

We also note that when a compensation court determines that the injured party is entitled to vocational rehabilitation services, that determination becomes final and appealable even though a vocational rehabilitation plan has not yet been developed. See *Rodriguez v. Monfort, Inc.*, 262 Neb. 800, 635 N.W.2d 439 (2001) (compensation court awarded employee permanent impairments for right and left upper extremities and ordered employer to pay medical and indemnity benefits, as well as awarded vocational rehabilitation services based on employee suffering pain in present job; entitlement to vocational rehabilitation services affirmed).

We do not read JBS' first assigned error as contesting the fact that the March 2019 award was a final order which granted Font the right to obtain a vocational rehabilitation evaluation; rather, JBS is arguing that the court's failure to make a finding on permanent restrictions in that order "amounts to a denial of Font's contention she suffered permanent restrictions." Brief for appellant at 14. JBS then argues, "Without permanent restrictions, Font can return to all pre-injury employment and is not entitled to vocational rehabilitation services[.]" *Id*. at 16. In other words, JBS does not contest Font's right to have a vocational rehabilitation evaluation; rather, it is arguing that because of the finality of the March 2019 award which failed to establish any permanent restrictions, that factor should preclude Font from receiving the vocational rehabilitation services proposed in Ruhland's plan because those services are premised upon Font having permanent restrictions.

Similarly, the Trust Fund contends that the March 2019 order did not order vocational rehabilitation services; rather, "[i]t ordered a vocational rehabilitation evaluation." Brief for appellee Trust Fund at 2. The Trust Fund argues that no appeal was taken from the March 2019 order because "there was no error made by ordering an *evaluation*." *Id*. (emphasis in original). Like JBS, the Trust Fund's argument centers largely on the notion that the resulting vocational rehabilitation plan was "premised on FCE restrictions the compensation court considered and failed to order," and "[t]he compensation court's failure to adopt the FCE restrictions in its March 1, 2019 [order] is conclusive on the parties." *Id*.

Accordingly, neither JBS nor the Trust Fund dispute that the March 2019 order was final and appealable and that no appeal was taken from that order. Their challenges on appeal do not relate to Font's right to be further evaluated by the vocational rehabilitation counselor, Ruhland, who was appointed at the direction of the compensation court back in its October 31, 2017, order; rather, they challenge the compensation court's adoption of the vocational rehabilitation plan for various reasons, as will be discussed further below.

We conclude that the March 2019 initial award was a final, appealable order, which awarded to Font the right to be evaluated for purposes of determining her eligibility for vocational rehabilitation services or benefits, and if so, the nature and extent of those services or benefits. The lack of an appeal from the March 2019 order does not preclude JBS and the Trust Fund from appealing the subsequent December order which approved Ruhland's proposed vocational rehabilitation plan, as amended. The December order was timely appealed. We next address the assignments of error challenging that order.

## 2. ISSUE OF NO PERMANENT RESTRICTIONS

As just discussed, JBS' first assignment of error is not challenging the fact that the compensation court's initial award in March 2019 permitted a vocational rehabilitation evaluation.

Rather, JBS complains that the compensation court's adoption of Ruhland's vocational rehabilitation plan, as amended by the court, was clearly wrong and not supported by the record because the plan was based upon permanent restrictions that the compensation court did not adopt as part of its findings. Specifically, JBS points out that although the FCE restrictions relied upon by Ruhland were referenced in the March 2019 award, so were the opinions of Dr. Dugas, who concluded Font did not have any permanent restrictions. A vocational rehabilitation plan developed using restrictions contained in an FCE not stipulated to by the parties or adopted by the court is understandably concerning. However, as we will discuss next, we conclude the lack of articulated permanent restrictions by the court and Ruhland's reliance on the FCE's restrictions do not preclude Font's entitlement to vocational rehabilitation services.

As we previously observed, the record reflects that the compensation court was aware there was disagreement between the parties on the issue of whether Font had any permanent restrictions. Just prior to the commencement of trial testimony, Font's attorney informed the court that in accordance with the court's October 31, 2017, order, Ruhland was appointed as the vocational rehabilitation counselor to perform an initial evaluation, "[b]ut because the parties could not agree on what the permanent restrictions are, no vocational plan has been prepared or submitted to the Court." The compensation court recognized there was a disagreement "on the shoulder as to if there are any restrictions or not[,]" and "that makes a difference on whether or not I send her out to a plan . . . if she needs one."

The compensation court ultimately concluded in its initial March 2019 award that Font was entitled to a vocational rehabilitation evaluation; thus, implicit in that determination is its conclusion that Font was unable to perform suitable work for which she had previous training or experience. See Neb. Rev. Stat. § 48-162.01(1) (Reissue 2010) (when as result of injury, employee is unable to perform suitable work for which he or she has previous training or experience, he or she is entitled to such vocational rehabilitation services, including job placement and training, as may be reasonably necessary to restore him or her to suitable employment). Further, if Font was able to return to work, she would not have been entitled to vocational rehabilitation. See *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 206, 639 N.W.2d 94, 103 (2002) (pursuant to § 48-162.01(3), "if one is able to return to work, he or she is not entitled to vocational rehabilitation"). No one appealed from the initial award, thus indicating no dispute that Font was unable to return to work at that point in time. The dispute arose only when Ruhland indicated she could not develop a vocational rehabilitation plan without an agreement by the parties or a court order related to permanent restrictions.

Ruhland's request for clarification on restrictions resulted in the May 21, 2019, order, in which the compensation court provided an inexhaustive list of factors to be considered in formulating a vocational rehabilitation plan, which included loss of bodily function. Also, at the hearing held December 13, the compensation court remarked that "you're all hung up on restrictions but obviously if a doctor says a person has 11 percent loss of use, is that arm as good as it was before?" The court stressed that at the initial trial, Font did not testify about restrictions; rather, she testified about "the inability of what she could do. That's a loss of use." The court emphasized that "loss of use is not necessarily a restriction" and that if "you can't use your arm anymore," "you have a loss of use." The court later reiterated, "[Font] doesn't have any restrictions, she only has loss of use." Font subsequently testified her right shoulder is painful and

she cannot lift her arm past her chest and it hurts when she lifts something with her right arm below chest level. The court focused on Font's 11-percent permanent impairment to her right shoulder and its impact on Font's loss of use of her right arm. The court acknowledged that "[w]hile the vocational rehabilitation plan may be more difficult to prepare because there are no restrictions, [Font] remains entitled to the preparation of and approval of a plan, because of a loss of use of an arm."

Notably, the applicable statute does not explicitly require a determination of permanent restrictions. Section 48-162.01(1) states that "[o]ne of the primary purposes of the Nebraska Workers' Compensation Act is restoration of the injured employee to gainful employment." The statute further provides:

When as a result of the injury an employee is unable to perform suitable work for which he or she has previous training or experience, he or she is entitled to such vocational rehabilitation services, including job placement and training, as may be reasonably necessary to restore him or her to suitable employment. . . .

. . . . The vocational rehabilitation counselor . . . shall evaluate the employee and, if necessary, develop and implement a vocational rehabilitation plan. Any such plan shall be evaluated by a vocational rehabilitation specialist of the compensation court and approved by such specialist or a judge of the compensation court prior to implementation. In evaluating a plan the specialist shall make an independent determination as to whether the proposed plan is likely to result in suitable employment for the injured employee that is consistent with the priorities listed in this subsection. . . .

The following priorities shall be used in developing and evaluating a vocational rehabilitation plan. No higher priority may be utilized unless all lower priorities have been determined by the vocational rehabilitation counselor and a vocational rehabilitation specialist or judge of the compensation court to be unlikely to result in suitable employment for the injured employee that is consistent with the priorities listed in this subsection. If a lower priority is clearly inappropriate for the employee, the next higher priority shall be utilized. The priorities are, listed in order from lower to higher priority:
(a) Return to the previous job with the same employer;
(b) Modification of the previous job with the same employer;
(c) A new job with the same employer;
(d) A job with a new employer; or
(e)A period of formal training which is designed to lead to employment in another career field.

§ 48-162.01(3).

The statute is clear that an employee is entitled to vocational rehabilitation services as may be reasonably necessary to restore the employee to suitable employment when the employee is unable to perform suitable work for which the employee has previous training or experience. Further, § 48-162.01(7) states that the compensation court "may also modify a previous finding, order, award, or judgment relating to physical, medical, or vocational rehabilitation services as necessary in order to accomplish the goal of restoring the injured employee to gainful and suitable

employment, or as otherwise required in the interests of justice." Thus, the ability for the court to establish steps in Font's plan, subject to further stipulations or orders, is supported by the statute.

Determination as to whether an injured employee is able to perform the work for which that employee was previously trained is a question of fact to be determined by the trial judge, and that determination will not be disturbed by an appellate court unless the judge's finding is clearly erroneous. *Green v. Drivers Mgmt., Inc., supra*. In that case, the Nebraska Supreme Court held:

> Without a finding of permanent medical impairment, there can be no permanent restrictions. Without impairment or restrictions, there can be no disability or labor market access loss. Absent *permanent impairment or restrictions*, the worker is fully able to return to any employment for which he or she was fitted before the accident, including occupations held before the injuries occurred. As § 48-162.01(3) indicates, if one is able to return to work, he or she is not entitled to vocational rehabilitation.
>
> . . . .
>
> To hold that a worker can receive vocational rehabilitation benefits absent a finding that the worker is permanently impaired does not amount to a sensible reading of the statute. Thus the factual findings, in light of § 48-162.01 do not support a finding that [the employee] is entitled to vocational rehabilitation as a matter of law.

*Green v. Drivers Mgmt., Inc.*, 263 Neb. at 206-07, 639 N.W.2d at 103-04 (emphasis supplied).

JBS argues that *Green v. Drivers Mgmt., Inc., supra*, supports its argument that the compensation court's failure to make a finding regarding permanent restrictions precludes the adoption of a vocational rehabilitation plan. However, in *Green*, none of the employee's physicians assigned a permanent impairment rating or gave permanent physical restrictions, nor did the compensation court make a specific finding of impairment. The compensation court nevertheless found the employee suffered a 50-percent loss of earning capacity as a result of the injury. On initial appeal to this court, we found it was clear error to assign a 50-percent permanent partial disability when the record contained no evidence that the employee suffered a permanent impairment to his body as a whole. See *Green v. Drivers Mgmt., Inc.*, 10 Neb. App. 299, 634 N.W.2d 22 (2001). This court also concluded that since § 48-162.01 no longer had a requirement that an injured worker have a permanent disability to be eligible for vocational rehabilitation benefits, the award of such benefits was not affected by the lack of a permanent impairment. See *id*. On further review, the Supreme Court agreed that a 50-percent permanent partial disability could not be established when the record did not indicate that the employee suffered a permanent impairment. However, the Supreme Court disagreed with this court that the employee was entitled to vocational rehabilitation benefits when there was no evidence the employee was permanently disabled.

Notably, *Green v. Drivers Mgmt., Inc.,* 263 Neb. 197, 639 N.W.2d 94 (2002), says that the absence of permanent impairment *or* restrictions suggests an employee can return to work as before the accident, and under those circumstances, the employee is not entitled to vocational rehabilitation. In this case, although the compensation court did not articulate any findings regarding Font's permanent physical restrictions, it did conclude Font had an 11-percent permanent impairment of the right upper extremity, which the court also characterized as "an 11 percent loss of use of her right arm." Therefore, the court's failure to make a finding on specific

- 11 -

restrictions does not by itself preclude Font from receiving vocational rehabilitation services since, unlike the circumstances in *Green*, the court affirmatively concluded that Font had an 11-percent permanent loss of use of her right arm.

We also find some guidance in *Rodgers v. Nebraska State Fair*, 288 Neb. 92, 846 N.W.2d 195 (2014). In that case, the Nebraska Supreme Court dealt with the application of Neb. Rev. Stat. § 48-121(3) (Reissue 2010) to an employee who suffered injuries to both of his knees in a work-related accident. Section 48-121(3) provides the compensation court discretion to determine an employee's loss of earning capacity in those instances where an injured person has "a loss or loss of use of more than one member" from the same accident and the court determines that compensation benefits for the scheduled members alone do not adequately compensate the employee for such loss or loss of use and results in at least 30-percent loss of earning capacity. In *Rodgers*, although the employee was given an impairment rating for both knees, the medical evidence only provided permanent physical restrictions for his right knee. A vocational rehabilitation counselor nevertheless determined that the employee had a 65-percent loss of earning capacity. The compensation court concluded it was unable to perform a loss of earning power calculation in the absence of expert proof of permanent restrictions relating to the left knee and therefore limited its award based on scheduled member benefits only. It determined that "'there must be at least a functional loss of use in the form of permanent physical restrictions for each scheduled member' in order to perform a loss of earning capacity calculation." *Rodgers v. Nebraska State Fair*, 282 Neb. at 97, 846 N.W.2d at 200.

The Supreme Court reversed the compensation court, holding that "the court erred as a matter of law when it limited the application of the new remedy to only those cases in which an expert opinion existed regarding the permanent physical restrictions as to each injured member, an element not found in the statutory language and not essential to the performance of a loss of earning capacity calculation." *Id*. at 100, 846 N.W.2d at 201. The Supreme Court pointed out that nothing in the statutory language of § 48-121(3) required expert proof of permanent physical restrictions as to each member. Citing to *Green v. Drivers Mgmt., Inc., supra*, the Supreme Court stated, "We have often noted the necessity, in the alternative, of proof of impairment or restrictions at the loss of earning analysis stage, but we have not been directed to authority which requires proof of both impairment and restrictions before undertaking a loss of earning capacity analysis." *Rodgers v. Nebraska State Fair*, 288 Neb. at 103, 846 N.W.2d at 203-04. The Supreme Court concluded that § 48-121(3) did not require expert proof of permanent physical restrictions assigned to each injured member in order to perform the loss of earning capacity assessment.

Although *Rodgers v. Nebraska State Fair, supra*, addressed the absence of permanent restrictions in the context of a loss of earning capacity analysis, we nevertheless find instructive its determination that both impairment and restrictions are not necessary to perform such an analysis. Although evaluating the priorities to determine a proper level of vocational rehabilitation is not identical to performing a loss of earning analysis, there are certainly overlapping considerations. See *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019) (loss of earning capacity factors include worker's eligibility to procure employment generally, ability to earn wages, ability to hold job obtained, and capacity to perform work in job in which worker is engaged). Additionally, *Rodgers* pointed out that nothing in the statutory language of § 48-121(3) required expert proof of permanent physical restrictions as to a scheduled

member. And, as previously noted, there is no language in § 48-162.01 which requires a specific finding of permanent physical restrictions before vocational rehabilitation services can be considered.

Accordingly, the compensation court's failure to make a finding of permanent physical restrictions did not preclude consideration of a vocational rehabilitation plan to determine how to return Font to suitable employment under § 48-162.01(3).

### 3. ADOPTION OF AMENDED VOCATIONAL REHABILITATION PLAN

JBS' remaining assignment of error relates to the compensation court's approval of a plan that was based on permanent restrictions that were not adopted by the court. The November 28, 2017, FCE, upon which Ruhland relied, was entered into evidence at trial. The March 2019 award referenced the FCE being a "valid test" that found Font "met full sedentary into light categories" in functional tolerance and outlined restrictions on her capacity to work. Following that FCE, Font was subsequently called back to work at JBS in January 2018, and she was given "new restrictions of being sedentary or seated" and she started a new job in the laundry department organizing or pairing gloves. JBS then terminated her post in March. Font was told that if her restrictions changed in the future and they could be accommodated, then she "might have a job with them again." Font never returned to work at JBS.

Notwithstanding the compensation court's lack of findings concerning permanent or "formal" restrictions, inherent in the court's finding of entitlement to vocational rehabilitation services and subsequent approval of the adopted vocational rehabilitation plan was the court's determination that Font was "unable to perform suitable work for which she has previous training or experience." See § 48-162.01(3). The record offers sufficient support for the compensation court's determination that Font was not able to perform work for which she had experience or training. In ordering the vocational rehabilitation plan, the compensation court drew from the medical records and reports entered into evidence as well as Font's self-reported limitations on what she could and could not do. In determining the inability of a claimant to earn wages in the same or a similar kind of work for which he or she was trained or was accustomed to performing, a trial judge in a workers' compensation case may rely on the claimant's testimony. See *Krause v. Five Star Quality Care*, 301 Neb. 612, 919 N.W.2d 514 (2018). During the December 2019 hearing, Font affirmed that her capacity to lift, carry, push, and pull was substantially limited by the pain such activities caused in her right arm. She further testified that, following the termination of her employment with JBS, she had accepted two separate employment positions, but was quickly dismissed from each position due to the pain in her right arm preventing her from performing the work. She also stated that she believed that she could not perform the jobs that she has previously held or otherwise been trained to perform.

From this evidence, the court made several findings and statements on the record concerning Font's inability to perform suitable work. As previously noted, the court found in its March 2019 award that Font had "an 11 percent loss of use of her right arm" as a result of her injury suffered on November 28, 2016. The court reiterated this impairment rating in its December 2019 order and wrote that "[w]hen one has a loss of use of a member resulting in the member not being able to function as it used to and limiting the use of that member to engage in employment activities, then one has an impairment and is entitled to vocational rehabilitation services." The

court also acknowledged that "[w]hile the vocational rehabilitation plan may be more difficult to prepare because there are no restrictions, [Font] remains entitled to the preparation of and approval of a plan, because of a loss of use of an arm."

Although Ruhland used the restrictions contained in the FCE as the basis for the proposed vocational rehabilitation plan, the compensation court's adoption of the plan, as amended, demonstrates the court's agreement with the plan's goal of Font learning English sufficiently to attend a community college designed to redirect her from physical labor to more clerical, office-based positions. The court's determination that Font was unable to perform work for which she was previously trained is a question of fact which we will not disturb on appeal unless that finding is clearly erroneous. *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002) (determination that injured employee is able to perform work for which employee was previously trained is question of fact to be determined by trial judge, and will not be disturbed by appellate court unless finding is clearly erroneous).

Because the record sufficiently supports the court's adopted vocational rehabilitation plan, we cannot say the court's December 2019 order was clearly wrong.

4. TRUST FUND'S CROSS-APPEAL

(a) Font's Ability to Return to Suitable Work

The Trust Fund assigns that the compensation court erred "by disregarding the first-part of the two-part test for eligibility of vocational rehabilitation benefits." It contends that while Font had a permanent impairment rating to her right shoulder, she had to also demonstrate she was unable to return to suitable work in order to qualify for vocational rehabilitation benefits. In that regard, the Trust Fund claims the "compensation court failed to make factual findings regarding how the permanent shoulder injury impacts [Font's] ability to get and perform suitable work." Brief for appellee Trust Fund on cross-appeal at 5.

While phrased differently than JBS' assigned error regarding the lack of permanent restrictions precluding vocational rehabilitation services, we view the gist of the Trust Fund's argument as being similar and we need not reiterate our analysis again here. To the extent the Trust Fund is challenging the compensation court's initial determination that Font qualified for a vocational rehabilitation evaluation, and thus implicitly determining she could not work and required an assessment to determine how to restore her to suitable employment, the time to appeal that determination was within 30 days of the initial award.

(b) Rule 11

The Trust Fund argues on cross-appeal that the compensation court failed to render a decision complying with the requirements of Rule 11(A) of the Nebraska Workers' Compensation Court Rules of Procedure. More specifically, the Trust Fund asserts that the March 2019 award and the December order "contradict one another" due to the court's adoption of the amended plan as described above and therefore "fail to provide a reasoned decision" concerning the issues before the court. Brief for appellee Trust Fund on cross-appeal at 9.

Rule 11(A) provides that "[d]ecisions of the court shall provide the basis for a meaningful appellate review. The judge shall specify the evidence upon which the judge relies." Rule 11 is designed to ensure that compensation court orders are sufficiently clear in addressing requests for

relief in order that an appellate court can review the evidence relied upon by the trial judge in support of his or her findings. *Hadfield v. Nebraska Med. Ctr.*, 21 Neb. App. 20, 838 N.W.2d 310 (2013).

As described above, we found no contradiction between the compensation court's award and order concerning the court's findings of no "formal restrictions" and the amended vocational rehabilitation plan. The court identified the medical records, reports, and opinions that it relied on in making its findings, and found the amended plan to be appropriate in light of its determination of Font's impairment and inability to work in the same or similar capacity as before. We find the compensation court's award and order provided sufficient detail to allow for meaningful appellate review and therefore complied with the requirements of rule 11(A).

### (c) Shifting Responsibility of Making Factual Findings

The Trust Fund argues on cross-appeal that the compensation court erred by shifting the court's responsibility of making factual findings regarding disability to Ruhland, the court-appointed vocational counselor. The Trust Fund asserts the court erroneously shifted its role as fact finder to Ruhland when the court adopted, with amendments, Ruhland's plan that she drafted based on permanent restrictions not adopted by the court.

Regardless of Ruhland's expertise and her role in drafting the plan offered to the compensation court, the court did not shift its responsibility as fact finder. As described previously, the parties apprised the court that Ruhland's drafted plan was based on permanent restrictions not included in the court's findings. The court, informed of this fact, deemed the amended plan appropriate in light of the evidence adduced at trial and the subsequent hearings. As noted previously, the record contains sufficient evidence concerning Font's impairment and incapacity to perform suitable work for which she has training or experience to support its order. The compensation court, in its role as fact finder, relied upon this evidence in finding its adopted plan appropriate to this case. As previously stated, we find no error in the court's December 2019 order.

### VI. CONCLUSION

The compensation court's December 23, 2019, order is affirmed in all respects.

AFFIRMED.